[No. H030630. Sixth Dist. Apr. 24, 2008.]

THE PEOPLE, Plaintiff and Respondent, v.
AGUSTIN SANTILLAH URIBE, Defendant and Appellant.

**[CERTIFIED FOR PARTIAL PUBLICATION\*]**

---

*Pursuant to California Rules of Court, rule 8.1105(c)(2), this opinion is certified for publication with the exception of the Factual Background, parts I. and II.; Procedural Background; and Discussion, parts I. and II.C.3.

## COUNSEL

George O. Benton and David D. Martin, under appointments by the Court of Appeal, for Defendant and Appellant.

Edmund G. Brown, Jr., Attorney General, Dane R. Gillette and Gerald A. Engler, Assistant Attorneys General, Seth K. Schalit and Sharon Wooden, Deputy Attorneys General, for Plaintiff and Respondent.

## Opinion

**DUFFY, J.**—Defendant Agustin Santillah Uribe was convicted following a jury trial of two counts of aggravated sexual assault of a child (Pen. Code, §§ 269, 261, subd. (a)(2)),[1] and two counts of lewd or lascivious acts on a child (§ 288, subd. (a)). The sex crimes involved defendant's granddaughter, Anna Doe (Anna). The court denied defendant's two separate motions for new trial and sentenced defendant to a term of 30 years to life, consecutive to eight years in prison.

Defendant contends that his first new trial motion should have been granted because the prosecution's nondisclosure of a videotape of a medical examination of Anna—an examination commonly (and hereafter) referred to as a SART (sexual assault response team) exam—constituted prejudicial *Brady* error (*Brady v. Maryland* (1963) 373 U.S. 83 [10 L.Ed.2d 215, 83 S.Ct. 1194]). (Hereafter, this videotape is sometimes referred to as the SART video.) He contends further that, irrespective of whether the nondisclosure constituted *Brady* error, the SART video constituted newly discovered evidence that warranted the granting of defendant's first new trial motion.

Defendant also argues that Anna's posttrial execution of a declaration recanting her claims that her grandfather sexually assaulted her constituted newly discovered evidence that required the granting of his second new trial motion. A further claim of error concerns the court's preclusion of defense counsel's cross-examination of Anna as to whether her therapist had coached her testimony. Defendant also urges that the trial court erred by permitting the testimony of a prosecution investigator concerning child sexual abuse accommodation syndrome (hereafter CSAAS). Lastly, defendant contends that there was an insufficient basis for giving an instruction concerning CSAAS.

We conclude that nondisclosure of the SART video by the prosecution constituted prejudicial *Brady* error. We therefore reverse the judgment and remand the matter for a new trial.[2]

---

[1] All further statutory references are to the Penal Code unless otherwise stated.

[2] In his separate petition for habeas corpus that we ordered to be considered with this appeal (*In re Uribe* (H032506)), defendant raises factual material outside of the record at trial in support of his contention that he did not receive effective assistance of counsel with respect to a failure to obtain an evaluation of the physical evidence by a SART examiner expert both at trial and in connection with the first motion for new trial. Because we conclude in the appeal that the judgment must be reversed, the issues in the habeas corpus petition are moot. Accordingly, by separate order of this date, we deny the petition for habeas corpus on that basis.

## FACTUAL BACKGROUND[3]

I., II.[*]

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

### III. Medical Testimony[11]

#### A. Testimony of Mary Ritter (Prosecution)

Mary Ritter is a physician assistant, clinic coordinator, and the primary examiner at the Center for Child Protection (Center) in the department of pediatrics at Santa Clara Valley Medical Center (Valley Medical). As of the time of trial, she had been employed at Valley Medical for over 18 years and had been the primary examiner for nearly that entire time. In that capacity, Ritter saw the majority of children brought to the Center at Valley Medical in the daytime by the police or child protective services for sexual abuse examinations, known as SART exams. She received her training in performing these examinations from Dr. David Kerns, medical director of the Center. As of the time of trial, Ritter had performed roughly 4,000 SART exams. The trial court qualified her as an expert in the field of child sexual assault and the examination of children alleged to have been sexual assault victims.

A SART exam occurs as a result of an initial contact to the Center at Valley Medical by the police or social services. Ritter routinely takes a history from the investigative officer. After performing a physical examination of the child head to toe, Ritter, in the case of a girl, would perform a genital examination, using a special instrument called a colposcope. The colposcope has a camera attached to it that permits the examiner to take magnified photographs. The child is examined while she is lying on her back with her feet in stirrups (supine position). After this portion of the genital examination is completed, "a real[ly] important part of the examination" involves turning the child over so that she is positioned on her hands and knees with her knees brought up to

---

[3] Because our evaluation of defendant's claim of *Brady* error requires us to give significant consideration to the totality of the evidence adduced at trial in the context of determining the potential significance of the omission of the SART video, we necessarily recite the testimony in detail here.

[*] See footnote, *ante*, page 1457.

[11] Mary Ritter was the first witness called for the prosecution. Defense expert Dr. Theodore Haritan and prosecution expert Dr. David Kerns did not testify until seven days and 15 days after Ritter testified, respectively. We present the medical evidence together here in order to provide a more cohesive recitation of the facts.

her chest (knee-chest position). Because (1) "[t]he most common place for a penetrating injury is the bottom portion of the . . . hymen," and (2) "gravity" often makes it more difficult to get a clear view of the hymen when the child is in the supine position, it is often easier for the examiner to observe evidence of injury when the child is in the knee-chest position. If the SART exam occurs within 72 hours of the alleged assault and there is any chance of getting forensic evidence for the crime lab, Ritter would swab the alleged victim for DNA. Even if the alleged assault were not recent, the SART examiner might obtain cultures to test for sexually transmitted diseases. After the completion of the examination, Ritter would get the photographs from the SART exam developed, obtain any laboratory studies, prepare a report, and send the report to the investigator on the case.

Ritter explained that for prepubescent girls, the results of SART exams fall within a spectrum. At one end, there would be no objective evidence of injury. At the other end of the spectrum, there would be evidence of "absolute tears of the vaginal opening, the hymenal opening. And then . . . in the middle of that spectrum, . . . there would be bruises and abrasions." Ritter testified that it would often be the case that a child victim of sexual assault would present with normal findings after a SART exam.[12] This would be explained by the fact that, in her experience, between 85 to 90 percent of alleged child victims do not report assaults immediately and are examined at least three days and as long as years after the alleged assault. Thus, injuries resulting from sexual penetration, such as bruising and tearing, may have had enough time to heal because of the victim's delayed reporting of the assault.

On July 28, 2005, Ritter performed a SART exam of Anna. She was accompanied by a counselor from the children's shelter. Anna chose to have the counselor wait in the reception area rather than to have her present during the SART exam. Ritter interviewed Anna to obtain a history that would be relevant for the medical examination. She told Anna that she was examining her because she had heard that Anna's grandfather had sexually assaulted her. Ritter asked whether Anna, around the time of the sexual assault, had experienced pain when she urinated. Anna responded in the negative "and then she proceeded to say that never really did happen."

Ritter conducted a SART exam of Anna. She examined Anna in the supine position; Ritter did not note an injury but felt that there was too much tissue for her to get a complete view of the hymenal opening. After this portion of the examination, she had Anna position herself in the knee-chest position.

---

[12] Ritter estimated that of the approximate 4,000 SART exams she had performed, she found "definite evidence of penetrating trauma in about 10 percent of those cases."

From this position, Ritter determined that there was evidence of an old injury. "[I]nstead of having [a] nice smooth broad hymen, . . . [Ritter] saw . . . a V-shape configuration that went up at 1:00 o'clock almost . . . to the fossa." It "[was] not a recent tear." She opined that this V-shaped configuration was evidence that "the hymen tissue that was here has been torn and when hymen tears it doesn't heal by knitting together like cutting a skin . . . . It doesn't come over and smooth over like nothing happened. When hymen tissue tears[,] it's essentially going to stay, that's going to stay there." "[T]here was nearly no hymen at all at the point of the V."

During the examination, Ritter observed a small red area at the edge of the hymen. She did not believe that it represented an injury, but swabbed it to determine if it was an infection, possibly herpes. Ritter also took a culture of Anna's vaginal area to rule out the existence of any sexually transmitted diseases. The test results were negative for any infection or sexually transmitted diseases.

Ritter concluded that there was physical evidence "consistent with a penetrating event occurring." Both Ritter and her superior, Dr. Kerns, signed off on a written report containing Ritter's findings as described in her testimony.

On cross-examination, Ritter confirmed that it was her opinion that the V-shaped configuration represented a hymenal tear that was evidence of penetrating trauma. She testified that "it certainly is a deep tear. It's not the deepest kind of tear that we have seen." There would be severe pain associated with the type of tearing Ritter concluded had occurred in this instance. In response to questioning as to whether the condition she had observed could have been consistent with a normal variation as opposed to evidence of a penetrating event, Ritter testified that she had never seen any studies or instances in which such a V-shaped configuration was within limits of a normal condition.[13] She also testified on cross-examination that she would not necessarily expect that there would have been heavy observable bleeding at the time of the penetrating event that resulted in the tearing of the hymen as she concluded had occurred with Anna. There might have been observable bleeding, or, alternatively, the blood might have "essentially [been] absorbed back into the tissue and sitting in the vaginal canal." Ritter

---

[13] In response to the court's questioning as to "whether it is possible that that V-shape narrowing at the end . . . could be a normal variation in Anna Doe," Ritter responded: "I have to— . . . in medicine you can't ever say that anything is impossible so I suppose it's possible. I've never seen anything in scientific literature saying that that is normal, but she could be the one example."

testified that she had "seen lots of [hymenal] tears that bled and the child didn't seem to be aware that [she was] bleeding."

### B. *Dr. Theodore Hariton (Defense)*

Defendant called an expert, Dr. Theodore Hariton, a retired medical doctor specializing in obstetrics and gynecology who had practiced for 40 years. He reviewed the Valley Medical records, including photographs, concerning the July 2005 SART exam of Anna. Dr. Hariton did not examine or interview Anna and did not speak with Ritter. Although he had sat through a course concerning SART exams, he had never performed or observed one. He testified that he had performed between 150,000 to 250,000 gynecological examinations; of those examinations, approximately 15,000 to 25,000 involved patients under 16 years old and about 250 to 300 were of prepubescent girls. However, Dr. Hariton had never examined a prepubescent girl who had asserted that she had been a sexual assault victim.

From his review of the records and photos, Dr. Hariton arrived at the conclusion that "with reasonable medical certainty this [penetrating trauma] did not happen." After referring to unidentified photographic exhibits he stated that they depicted a condition "consistent with a partial tear and . . . also consistent with a normal variant of what hymens look like." He pointed in particular to one defense exhibit (exhibit I) as depicting what "can well be a normal hymen." He also testified that two photos from the SART exam that he looked at (exhibits H & J) appeared to reflect the examiner's, as part of standard procedure, stretching out the hymen in order to get a better view.

Dr. Hariton also based his disagreement with Ritter's opinion that there was physical evidence of penetrating trauma on the absence in the record of a report of pain and bleeding. He testified that there would be severe pain and bleeding associated with an adult male's putting his penis in the vagina of a five-year-old girl. Dr. Hariton testified that it would not have been possible for the blood associated with such trauma to have been simply reabsorbed inside the vagina. He also opined that he would expect that such a trauma would have resulted in the transection of the girl's hymen. From a review of the Valley Medical records and photographs from Anna's SART exam, Dr. Hariton concluded that Anna's hymen was not completely transected.

On cross-examination, Dr. Hariton stated that it was possible that the photos of Anna's SART exam did depict a hymenal tear and that such a tear

may have been caused by a sexual act. He added, however that he didn't think that that was the case.[14]

## C. *Dr. David Kerns (Prosecution Rebuttal)*

As of the time of trial, Dr. David Kerns—a pediatrician, medical director of the Center at Valley Medical, and a clinical professor of pediatrics at Stanford University School of Medicine—had approximately 30 years of experience in the subspecialty of the medical aspects of child abuse. Over the years, he had performed personally or "100 percent review[ed]" nearly 6,000 SART exams at Valley Medical.

Dr. Kerns did not personally perform the SART exam of Anna, but he did review the photos and the report of that examination performed by Ritter. In his opinion, Ritter did not do anything that resulted in the hymen falsely appearing on the photos to have had a V-shaped configuration. His medical opinion—which confirmed the opinion in the report—was "that there was definite physical evidence of penetrating trauma to [Anna's] hymen." Dr. Kerns described Anna's condition as being a complete transection of the hymen.

Dr. Kerns singled out one particular photograph of Anna in "the knee-chest position" (exhibit 4) as being the "critical" photograph supporting his conclusion. (He explained that the knee-chest position "gives the best exposure of . . . the hymenal anatomy.") Dr. Kerns noted that, in that photo, there was a V-shaped area of the hymen that evidenced the absence of hymenal tissue that was in such a "position and [to such a] degree of severity [as to not represent a] congenital variation[]." In Dr. Kerns's opinion, the finding of the existence of physical evidence of penetrating trauma in this instance was "not a close call."

According to Dr. Kerns, the most frequent type of hymenal tearing as a result of a penetrating trauma is posterior tearing of the type found in the case of Anna. On cross-examination, he agreed that, if an adult penis were forced into a nine-year-old girl's hymenal ring, it would be more likely than not that tearing, severe pain, and bleeding would result. Dr. Kerns testified "that the acute injury that led to these changes [in Anna's hymen] would have . . . likely [resulted in] bleeding." But "the absence of bleeding in a history is a

---

[14] After Dr. Kerns testified on rebuttal, Dr. Hariton was recalled as a witness by the defense. He reiterated that, after hearing Dr. Kerns's testimony, he was still of the opinion that there was "no real evidence that the penetration occurred in [Anna]." He also repeated that one of the photographs (exhibit I) depicted a normal-looking hymen in which one could "see a significant rim of hymen all the way on the top."

little bit . . . problematic" because in some instances, the child who suffered a hymenal tear that resulted in bleeding would not be aware of the bleeding.

Also on cross-examination, Dr. Kerns testified that he was familiar with a California form (No. 925; exhibit L), labeled "Forensic Medical Report: Non-acute . . . Child/Adolescent Sexual Abuse Examination." He did not specifically recall whether the form was used for Anna's SART exam.[15] It probably was not used, however, because Valley Medical's general policy was not to use such forms in nonacute cases; the information sought in the form was redundant to that provided in Valley Medical's SART exam reports.

Dr. Kerns also testified that one of the photo exhibits (exhibit I) that Dr. Hariton relied on to conclude that Anna did not have a damaged hymen was a bad photo. He did not believe that the hymen was even depicted in the photo.

PROCEDURAL BACKGROUND*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

DISCUSSION

I. *Issues on Appeal**

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

II. *The Videotape of the SART Exam—Claimed* Brady *Error*

A. *Background*

On June 23, 2006, defendant filed a (first) motion for new trial. This motion was founded upon defendant's, after the trial, learning of the existence, and obtaining a copy, of a videotape of Anna's SART exam. Defendant argued that the new trial motion should be granted because the videotape constituted "new evidence . . . discovered material to the defendant, and which he could not, with reasonable diligence, have discovered and produced at the trial" under section 1181, subdivision 8. He also contended that he was denied due process because the nondisclosure of the SART video constituted a *Brady* violation.

---

[15] That form has spaces in which the examiner can identify the nature and extent of any photographic, colposcopic, or videographic methods used to document the examination of the body and genitals of the patient.

*See footnote, *ante*, page 1457.

In an accompanying declaration, defense counsel stated that after the trial—in a conversation that apparently took place on March 28, 2006[17]—he had spoken with Ritter, who advised him that she was in possession of a videotape of the SART exam. He noted that prior to trial, on behalf of defendant, he had made a discovery request to the prosecution, inter alia, for all photographs and other documentation concerning Anna's SART exam; and had filed a motion to release documents previously produced by Valley Medical in response to a subpoena duces tecum issued by his office for all medical records concerning Anna.

The motion was also accompanied by the declaration of the defense trial expert, Dr. Hariton. After summarizing in his declaration the substance of his testimony at trial as well as the testimony of the prosecution's experts, Dr. Hariton stated that (1) there had been "one photo . . . not centered and slightly out of focus that supported [his] opinion regarding [the absence of] penetrating trauma"; (2) "Dr. Kerns testified that this single photo [Dr. Hariton] used to support [his] opinion had no forensic value because it was out of focus and the flash did not work properly in that photo"; (3) Dr. Kerns's "testimony was highly important and crucial to the case because said single photo contradicted Dr. Kerns['s] and Mary Ritter's testimony that the alleged victim sustained a transection of her hymen"; (4) he had viewed the SART video following the trial; (5) after isolating the portion of the video that corresponded with the photo on which he relied in his trial testimony, he concluded "[t]hat Dr. Kerns was incorrect when he testified that the picture [Dr. Hariton] referred to . . . did not depict the [hymenal] opening of the alleged victim"; (6) the "video clearly shows a circular [hymenal] opening that is clear, in focus, and similar to the photo [he] referred to in support of [his] opinion"; (7) he had obtained several additional photos from the video that also "clearly show an intact hymen with no evidence of a prior transection or trauma"; (8) although no photos had been available showing an examination of Anna in the supine position, the "video of the [hymenal] area in the supine position again shows an intact hymen with no evidence of a prior transection"; and (9) the "video is extremely important and necessary in this case," it fully supported his opinions given at trial, and contradicted the opinions of Dr. Kerns and Ritter.

---

[17] Prior to filing the first new trial motion, defense counsel brought a motion for issuance of a subpoena duces tecum directed to the custodian of records of Valley Medical in which he sought production of the SART video. That motion was accompanied by a declaration in which defense counsel noted that he learned about the SART video as a result of a March 28, 2006 conversation with Ritter. After obtaining an order from the trial court requiring Valley Medical to produce the videotape, defendant filed the first motion for new trial.

The prosecution opposed the new trial motion, arguing that there was no *Brady* error because (1) the video evidence was cumulative; (2) the SART video did not support Dr. Hariton's previous testimony; (3) it could not be concluded that, had the video been shown to the jury, a not guilty verdict would have been probable; (4) Valley Medical was not part of the "prosecution team" in that the videotaping was not performed for an investigative purpose; and (5) the SART video was not exculpatory evidence. The opposition was not accompanied by any declarations.

The trial court, in a lengthy written order, denied the motion for new trial on July 26, 2006. There was no hearing on the first motion for new trial that preceded the order.[18] The court concluded that there was no *Brady* error because "[m]edical or psychiatric evidence in the possession of a county hospital or clinic are not in the possession of the 'prosecution team' for purposes of the *Brady* rule." To the extent defendant's new trial motion was based upon newly discovered evidence, the court found Dr. Hariton's testimony to have not been credible; attached little weight to his declaration as a result; and, after its own review of the SART video, concluded that "[t]he existence of an intact hymen as described in the Defendant's moving papers and in the defense expert's declaration is not found in the videotape." The court therefore concluded that "[t]here is nothing exculpatory in the video-tape. In fact, the videotape refutes the defendant's trial position that the SART nurse manipulated the vagina into a position that created the look of a hymenal tear that did not exist." The court thus concluded that the videotape, if it had been produced before trial, "would not have made a difference to the outcome."

## B. Brady *Error Generally*

In *Brady*, the United States Supreme Court held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." (*Brady, supra,* 373 U.S. at p. 87.) Thus, under *Brady* and its progeny, the state is required to disclose to the defense any material, favorable evidence. (*Ibid.*; see also *United States v. Bagley* (1985) 473 U.S. 667, 674–678 [87 L.Ed.2d 481, 105 S.Ct. 3375] (*Bagley*).) Favorable evidence includes both evidence that is

---

[18] The record furnishes no explanation as to why there was no hearing on the first motion for new trial. There was initially a July 21, 2006 hearing date that was postponed one week. At the hearing on July 28, 2006 (two days after entry of the court's order), there was no reference to defendant's first new trial motion; rather, discussion concerned only the filing of the People's opposition to, and the scheduling of a hearing on, the second new trial motion that defendant had filed on July 27, 2006.

exculpatory to the defendant as well as evidence that is damaging to the prosecution, such as evidence that impeaches a government witness. (*Bagley, supra,* at p. 676; see also *In re Sassounian* (1995) 9 Cal.4th 535, 544 [37 Cal.Rptr.2d 446, 887 P.2d 527].)

■ Further, irrespective of whether the defendant made a request for discovery from the prosecution, "favorable evidence is material, and constitutional error results from its suppression by the government, 'if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.' " (*Kyles v. Whitley* (1995) 514 U.S. 419, 433–434 [131 L.Ed.2d 490, 115 S.Ct. 1555] (*Kyles*), quoting *Bagley, supra,* 473 U.S. at p. 682.) But the presence or absence of a specific request at trial is relevant to whether evidence is material under this test. " '[A]n incomplete response to a specific request not only deprives the defense of certain evidence, but also has the effect of representing to the defense that the evidence does not exist. In reliance on this misleading representation, the defense might abandon lines of independent investigation, defenses, or trial strategies that it otherwise would have pursued. [Citation.] [¶] We agree that the prosecutor's failure to respond fully to a *Brady* request may impair the adversary process in this manner. And the more specifically the defense requests certain evidence, thus putting the prosecutor on notice of its value, the more reasonable it is for the defense to assume from the nondisclosure that the evidence does not exist, and to make pretrial and trial decisions on the basis of this assumption.' [Citation.] Accordingly, in determining whether evidence was material, 'the reviewing court may consider directly any adverse effect that the prosecutor's failure to respond might have had on the preparation or presentation of the defendant's case.' [Citation.]" (*In re Steele* (2004) 32 Cal.4th 682, 700–701 [10 Cal.Rptr.3d 536, 85 P.3d 444], quoting *Bagley, supra,* at pp. 682–683.)

■ The Supreme Court in *Kyles* has identified four aspects to the materiality (i.e., prejudice) component of a *Brady* violation. (*Kyles, supra,* 514 U.S. at pp. 434–437; see also *In re Brown* (1998) 17 Cal.4th 873, 886–887 [72 Cal.Rptr.2d 698, 952 P.2d 715] (*Brown*).) First, "[a]lthough the constitutional duty is triggered by the potential impact of favorable but undisclosed evidence, a showing of materiality does not require demonstration by a preponderance that disclosure of the suppressed evidence would have resulted ultimately in the defendant's acquittal (whether based on the presence of reasonable doubt or acceptance of an explanation for the crime that does not inculpate the defendant). [Citations.] *Bagley*'s touchstone of materiality is a 'reasonable probability' of a different result, and the adjective is important. The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he

received a fair trial, understood as a trial resulting in a verdict worthy of confidence. A 'reasonable probability' of a different result is accordingly shown when the government's evidentiary suppression 'undermines confidence in the outcome of the trial.' [Citation.]" (*Kyles, supra*, 514 U.S. at p. 434, quoting *Bagley, supra*, 473 U.S. at p. 678.)

■ Second, "it is not a sufficiency of evidence test. A defendant need not demonstrate that after discounting the inculpatory evidence in light of the undisclosed evidence, there would not have been enough left to convict. The possibility of an acquittal on a criminal charge does not imply an insufficient evidentiary basis to convict. One does not show a *Brady* violation by demonstrating that some of the inculpatory evidence should have been excluded, but by showing that the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." (*Kyles, supra*, 514 U.S. at pp. 434–435, fn. omitted.)

Third, "once a reviewing court applying *Bagley* has found constitutional error there is no need for further harmless-error review. Assuming, *arguendo*, that a harmless-error enquiry were to apply, a *Bagley* error could not be treated as harmless, since 'a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different,' [citations] necessarily entails the conclusion that the suppression must have had " 'substantial and injurious effect or influence in determining the jury's verdict,' " [citation]." (*Kyles, supra*, 514 U.S. at p. 435.)

Fourth, "while the tendency and force of undisclosed evidence is evaluated item by item, its cumulative effect for purposes of materiality must be considered collectively. ([*Kyles, supra*, 514 U.S.] at pp. 436–437 & fn. 10 . . . ; see also [*United States v.*] *Agurs* [(1976)] 427 U.S. [97,] 112 [49 L.Ed.2d 342, 96 S.Ct. 2392, 2402], fn. omitted [omission 'must be evaluated in the context of the entire record'].)" (*Brown, supra*, 17 Cal.4th at p. 887.)

We utilize independent review in deciding whether *Brady* error occurred. (*People v. Salazar* (2005) 35 Cal.4th 1031, 1042 [29 Cal.Rptr.3d 16, 112 P.3d 14] (*Salazar*).)[19]

---

[19] "We have not previously addressed the standard of review applicable to *Brady* claims. [Citation.] Conclusions of law or of mixed questions of law and fact, such as the elements of a *Brady* claim [citation], are subject to independent review. [Citation.] Because the referee can observe the demeanor of the witnesses and their manner of testifying, findings of fact, though not binding, are entitled to great weight when supported by substantial evidence. [Citation.]" (*Salazar, supra*, 35 Cal.4th at p. 1042.)

We apply the above principles in our evaluation of defendant's claim that the nondisclosure of the SART video constituted *Brady* error.

### C. *Whether* Brady *Violation Occurred*

██ Although the term *"Brady* violation" is often broadly used to refer to any failure on the part of the prosecution to disclose favorable information to the defense, a true violation occurs only if three components coexist: "The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued." (*Strickler v. Greene* (1999) 527 U.S. 263, 281–282 [144 L.Ed.2d 286, 119 S.Ct. 1936] (*Strickler*); see also *Banks v. Dretke* (2004) 540 U.S. 668, 691 [157 L.Ed.2d 1166, 124 S.Ct. 1256].) The court below did not directly address—at least in the context of a claimed *Brady* violation— either the first or third elements. Rather, it concluded there was no *Brady* violation because "the SART nurse was [not] part of the 'prosecution team' within the meaning of *Brady*." We will address each of the three elements of a *Brady* violation below.

### 1. *Whether SART video evidence was favorable to defendant*

In establishing a potential *Brady* violation, "[e]vidence is 'favorable' if it either helps the defendant or hurts the prosecution, as by impeaching one of its witnesses. [Citation.]" (*In re Sassounian, supra,* 9 Cal.4th at p. 544.) Although neither party specifically addresses this element, we do so here.

Dr. Hariton in his declaration in support of the first new trial motion specifically stated that the portion of the SART video that corresponded with the photo (exhibit I) he relied on in his trial testimony contradicted Dr. Kerns's testimony that that photo did not depict Anna's hymen at all. The defense expert declared further that several photos he obtained from the SART video—including ones taken while Anna was in the supine position— offered additional evidence to support his trial testimony that Anna had "an intact hymen with no evidence of a prior transection or trauma." Dr. Hariton concluded that the SART video constituted "extremely important and neces-sary [evidence] in this case" that fully supported his opinions given at trial, and contradicted the opinions of Dr. Kerns and Ritter.

The People's opposition contained no evidence to refute the statements in Dr. Hariton's declaration. Rather, the People in their points and authorities

simply argued that Dr. Hariton's trial testimony and his subsequent declaration were entitled to no credence whatsoever. They made the unsupported assertion that "[a] viewing of the SART exam video does not support the previous testimony of Dr. Hariton."

Dr. Hariton's declaration established that the SART video was favorable both because it offered potential evidence impeaching a prosecution expert's testimony, and it was supportive of the opinions of defendant's expert. We have little difficulty concluding from the record presented here that the SART video constituted "favorable" evidence under *Brady*. (See *Salazar, supra*, 35 Cal.4th at p. 1048 [evidence allegedly withheld was favorable to the defendant, and real issue was whether its omission was prejudicial to establish *Brady* violation].)

### 2. *Whether SART video was suppressed*

The prosecution need not affirmatively suppress evidence favorable to the defense in order for there to be "suppression" under *Brady*. A good faith failure to disclose, irrespective of the presence of a defense request for the materials, may constitute the "suppression" necessary to establish a *Brady* violation. (*People v. Zambrano* (2007) 41 Cal.4th 1082, 1132 [63 Cal.Rptr.3d 297, 163 P.3d 4].)[20] Nor does the evidence necessarily have to be in the direct possession of the prosecution. As the Supreme Court has explained, "[T]he individual prosecutor has a duty to learn of any favorable evidence known to the others acting on the government's behalf in the case, including the police. But whether the prosecutor succeeds or fails in meeting this obligation (whether, that is, a failure to disclose is in good faith or bad faith, [citation]), the prosecution's responsibility for failing to disclose known, favorable evidence rising to a material level of importance is inescapable." (*Kyles, supra*, 514 U.S. at pp. 437–438; see also *Strickler, supra*, 527 U.S. at p. 281.)

"[A]ny favorable evidence known to the others acting on the government's behalf is imputed to the prosecution. 'The individual prosecutor is presumed to have knowledge of all information gathered in connection with the

---

[20] We use the term "suppression" advisedly and because it is the term used by the Supreme Court to identify the second element of a claimed *Brady* violation. (See *Strickler, supra*, 527 U.S. at pp. 281–282.) We acknowledge, however, that in light of the fact that a *Brady* violation may be proved without a showing that the prosecution intentionally concealed the evidence from the defense, the term "suppress" in this context may be somewhat misleading in that it might incorrectly suggest affirmative misconduct by the prosecution. (See Merriam-Webster's Collegiate Dict. (10th ed. 2001) p. 1181 ["**suppress:** . . . **2:** to keep from public knowledge: as **a:** to keep secret **b:** to stop or prohibit the publication or revelation of . . . "].)

government's investigation.' [Citations.]" (*Brown, supra*, 17 Cal.4th at p. 879; see also *Youngblood v. West Virginia* (2006) 547 U.S. 867 [165 L.Ed.2d 269, 126 S.Ct. 2188] [nondisclosure of note from prosecution witnesses read by state trooper but not shared with prosecutor constituted suppression for purposes of asserted *Brady* error].) Conversely, "the prosecution cannot reasonably be held responsible for evidence in the possession of *all* governmental agencies, including those not involved in the investigation or prosecution of the case." (*In re Steele, supra*, 32 Cal.4th at p. 697.) The "prosecution team" for purposes of *Brady* thus includes both investigative and prosecutorial agencies and personnel. (*Ibid.*; see *People v. Superior Court (Barrett)* (2000) 80 Cal.App.4th 1305, 1314–1315 [96 Cal.Rptr.2d 264]; see, e.g., *Brown, supra*, at p. 880 [holding crime laboratory assisting the district attorney's office in prosecution of cases "part of the investigative 'team' "].) "Courts have thus consistently 'decline[d] "to draw a distinction between different agencies under the same government, focusing instead upon the 'prosecution team' which includes both investigative and prosecutorial personnel." ' [Citation.] 'A contrary holding would enable the prosecutor "to avoid disclosure of evidence by the simple expedient of leaving relevant evidence to repose in the hands of another agency while utilizing his access to it in preparing his case for trial," [citation].' [Citations.]" (*Brown, supra*, 17 Cal.4th at p. 879, fn. omitted.)

We acknowledge that the parties have cited no authority—and our independent research has disclosed none—addressing whether a SART examiner (or the equivalent person or facility examining alleged sexual assault victims) is a member of the "prosecution team" for purposes of establishing the suppression element of a *Brady* violation. We therefore consider the circumstances presented here to ascertain whether the knowledge of the SART video gained by the personnel conducting Anna's SART exam at the Center at Valley Medical (Ritter and Dr. Kerns) will be imputed to the prosecution. As stated by the Fourth District Court of Appeal, "[t]he important determinant is whether the person or agency has been 'acting on the government's behalf' ([*Kyles*], *supra*, 514 U.S. at p. 437 . . .) or 'assisting the government's case.' ([*Brown*], *supra*, 17 Cal.4th at p. 881.)" (*People v. Superior Court (Barrett)*, *supra*, 80 Cal.App.4th at p. 1315.)

Dr. Kerns is the director of the Center, which he founded in 1985. The Center is "recognized as the place for evaluation in Santa Clara County in virtually 100 percent of the cases that come to [it]."[21] Ritter is the daytime

---

[21] Section 13823.9, subdivision (b) provides: "Each county with a population of more than 100,000 shall arrange that professional personnel trained in the examination of victims of sexual assault, including child molestation, shall be present or on call either in the county hospital which provides emergency medical services or in any general acute care hospital which has contracted with the county to provide emergency medical services. In counties with

person in the Center "who sees the majority of the children when the police . . . or Child Protective Services bring children to the hospital for child sexual abuse examinations." The police or social services initiate a SART examination to be performed by Ritter; an "officer or a social worker calls the Center and says they have a child to bring." In advance of the examination, Ritter obtains a history from the investigating officer who had previously interviewed the child. "All of [Ritter's] patients are essentially there because there is a concern of nonconsensual intercourse . . . . " Ritter's practice after completing the SART exam, and after obtaining photographs and any laboratory results from the exam, is to write a report and send that report to the investigating officer in the case. In this instance, Anna was brought to the Center by someone from the children's shelter for a SART exam. Prior to that visit, Ritter had spoken to a police officer concerning the reason Anna was being referred to the Center for a SART exam (i.e., the nature of Anna's allegations against her grandfather).

█ There is a statutory scheme addressing the function of SART exams in connection with the criminal investigative process. By legislative enactment, one hospital training center in the state was established for the purpose of, inter alia, "train[ing] medical personnel on how to perform *medical evidentiary examinations* for victims of child abuse or neglect, sexual assault, . . . [and] shall provide training for investigative and court personnel involved in dependency and criminal proceedings, on how to interpret the findings of medical evidentiary examinations." (§ 13823.93, subd. (b), italics added.)[22] Section 13823.93 was enacted in 1995 because of the Legislature's recognition that adequate training of medical professionals was essential both to provide for the medical needs of victims of domestic violence, child abuse, elder abuse, and sexual assault "and to provide comprehensive, competent *evidentiary examinations for use by law enforcement agencies*." (Stats. 1995, ch. 860, § 1, p. 6541, italics added.)[23]

---

a population of 1,000,000 or more, the presence of these professional personnel shall be arranged in at least one general acute care hospital for each 1,000,000 persons in the county." Although not explicitly found in the record, it is apparent that the Center at Valley Medical has been designated by the County of Santa Clara under section 13823.9, subdivision (b) as the county hospital in which personnel trained to examine sexual assault victims are present or on call to perform such services.

[22] In addition, the agency designated by the Department of Finance (as provided in § 13820) is responsible for establishing sexual assault examination training courses for qualified health professionals with curricula that include training in the collection and documentation of physical evidence (§ 13823.13, subd. (b)(2)), and in "[p]resent[ing] testimony in court" (§ 13823.13, subd. (b)(4)).

[23] The findings and declarations of the Legislature relative to the enactment of section 13823.93 were as follows: "The Legislature finds and declares all of the following: [¶] (a) The response of California's health care system to victims of violence, especially women and children, is inconsistent, in terms of both access to services and competence of health care workers. While services provided in some metropolitan centers may be excellent, access to

■ Under section 13823.9, subdivision (a), any public or private acute care hospital conducting an examination of a sexual assault victim (including a child molestation victim) "shall comply with the standards specified in Section 13823.11 and the protocol and guidelines adopted pursuant to Section 13823.5." The "minimum standards" under section 13823.11 for such examinations and for "the collection and preservation of evidence" include that "[l]aw enforcement authorities shall be notified" (§ 13823.11, subd. (a)); consent for the examination and collection of evidence be obtained in advance (§ 13823.11, subd. (c)(1)); the evidence collection conform to specified procedures (§ 13823.11, subd. (g)); and the physical evidence is to be preserved (§ 13823.11, subd. (h)) and "shall be turned over to the proper law enforcement agency" (§ 13823.11, subd. (h)(4)). The protocol adopted under section 13823.5 includes, inter alia, the collection of physical evidence and other medical specimens of the assault (§ 13823.7, subds. (e), (f)); specific procedures for preserving and disposing of such physical evidence (§ 13823.7, subd. (g)); and "[n]otification of injuries and a report of suspected child sexual abuse to law enforcement authorities" (§ 13823.7, subd. (a)). And none of the costs associated with a SART exam may be charged to the alleged victim; rather, they "shall be treated as local costs and charged to the local governmental agency in whose jurisdiction the alleged offense was committed." (§ 13823.95; see also § 1203.1h, subd. (b) [court may require a defendant convicted of sex crime, including child molestation, to reimburse cost incurred by county, local agency, or law enforcement agency "of any medical examinations conducted on the victim for the collection and preservation of evidence"].)

In their opposition to the first motion for new trial, the People argued, inter alia, that Valley Medical was not part of the "prosecution team" because the videotaping was not performed for an investigative purpose. They asserted that, while the written report containing the findings of the SART exam "is provided to the investigating police agency," Dr. Kerns and his staff "do not perform their examinations with the intention of aiding law enforcement."

---

trained medical practitioners is restricted and unevenly distributed throughout the state. [¶] (b) Many rural, midsized counties and geographically large urban areas lack health professionals who are properly trained in providing evidentiary examinations, collection, preservation, and documentation of evidence, and interpretation of findings, and who are experienced in collaborating with law enforcement agencies and investigating social workers. This results in victims being improperly examined and law enforcement agencies lacking critical evidence. [¶] (c) To appropriately respond to the medical care needs of victims of domestic violence, child abuse, elder abuse, and sexual assault, and to provide comprehensive, competent evidentiary examinations for use by law enforcement agencies, it is necessary to take immediate steps to ensure there are appropriately trained medical professionals throughout California." (Stats. 1995, ch. 860, § 1, p. 6541.)

The factual assertions in the opposition were unsupported by either citation to the record or by an accompanying declaration of any kind. In response to defendant's initial opening brief, the Attorney General again argues that Valley Medical is not part of the "prosecution team" for purposes of establishing a potential *Brady* violation. He argues that Ritter, in performing Anna's SART exam, "was not working on the government's behalf or assisting its case."[24]

We reject any suggestion that the SART exam here was not investigative. It was clearly spearheaded by the police, who advised Ritter of a report of alleged sexual abuse in which Anna was the victim. A major purpose of the examination was to determine whether the allegation could be corroborated with physical findings. Ritter collected and preserved physical evidence, consistent with statutory protocol. (See §§ 13823.11, 13823.7, subds. (e), (f).) And according to her practice—after completion of the SART examination and after she and Dr. Kerns reach concurrence as to their findings as contained in the written report—Ritter provided a copy of the forensic report to the police. (See §§ 13823.11, subds. (a), (h)(4), 13823.7, subd. (a).)

We believe that the circumstances presented in this case are aligned with those in *Brown, supra,* 17 Cal.4th 873, where the court held that the crime laboratory responsible for assisting the district attorney's office in the prosecution of its cases "was part of the investigative 'team.' " (*Id.* at p. 880.) There, as here, the defense received some but not all of the potentially relevant data from an agency assisting the prosecution, i.e., a crime laboratory. In *Brown*, the petitioner sought habeas corpus relief under *Brady* based upon the nondisclosure of a portion of the toxicology results of tests on his blood—a radioactive immunoassay (RIA) that was positive for phencyclidine (PCP)—where other results presented at trial (gas chromatography mass spectrometry [GC/MS]) were negative for PCP. (*Id.* at p. 877.) Although the crime laboratory sent the prosecution and the defense a copy of the " 'result sheet' " containing the GC/MS results, "for reasons of laboratory protocol," a

---

[24] This assertion is not supported by any citation to the record. Instead, the Attorney General states in a footnote that Ritter's duties at Valley Medical included matters other than SART exams, i.e., performing physical examinations of girls detained in juvenile hall. This fact does nothing to negate the essentially investigative function that Ritter and others at the Center played in performing SART exams on children referred by the police or social services based upon reports of child sexual abuse. Furthermore, defendant, in his supplemental opening brief, included some six pages of further argument on the suppression issue. While we do not assume that the issue is conceded, it is perhaps of some significance that the Attorney General, neither in the supplemental respondent's brief nor in oral argument, even addresses the legal question of whether the Center was part of the "prosecution team." Rather, the Attorney General argues only that defendant failed to establish the materiality element of a *Brady* violation.

copy of a " 'worksheet' " containing the RIA results was not routinely sent by the lab. (*Ibid.*) The Supreme Court held that the lab was part of the "prosecution team" for *Brady* purposes, concluding that "[t]he prosecutor thus had the obligation to determine if the lab's files contained any exculpatory evidence, such as the worksheet, and disclose it to petitioner. Whether or not he actually did examine the files, the lab personnel's knowledge is imputed." (*Brown, supra*, at p. 880.) It reasoned, "Any other rule would leave the defendant's due process rights to the fortuity of a subordinate agency's procedural protocol, which the Supreme Court has squarely rejected." (*Id.* at pp. 880–881, citing *Kyles, supra*, 514 U.S. at p. 438.)

The court below cited *People v. Webb* (1993) 6 Cal.4th 494, 517–518 [24 Cal.Rptr.2d 779, 862 P.2d 779] (*Webb*) in support of its conclusion that the SART video was not suppressed because "[m]edical or psychiatric evidence in the possession of a county hospital or clinic [is] not in the possession of the 'prosecution team' for purposes of the *Brady* rule." But the circumstances in *Webb* were very different from those we confront here. In *Webb*, the issue was not a claimed *Brady* violation. Rather, the defendant claimed that the trial court had erred in refusing to release subpoenaed psychiatric records pertaining to the treatment of his girlfriend, Sharon, and that this error had prevented him from effectively cross-examining her at trial. (*Webb, supra*, at p. 517.) After the *Webb* court acknowledged that under *Pennsylvania v. Ritchie* (1987) 480 U.S. 39, 56–58 [94 L.Ed.2d 40, 107 S.Ct. 989], "the due process clause requires the 'government' to give the accused all 'material' exculpatory evidence 'in its possession,' even where the evidence is otherwise subject to a state privacy privilege, at least where no clear state policy of 'absolute' confidentiality exists," it questioned as a threshold matter "whether records stemming from Sharon's voluntary treatment by private and county therapists can be deemed 'in the possession' of the 'government' in the manner assumed by *Ritchie*. The records were not generated or obtained by the People in the course of a criminal investigation, and the People have had no greater access to them than [the] defendant. Given the strong policy of protecting a patient's treatment history, it seems likely that [the] defendant has no constitutional right to examine the records even if they are 'material' to the case." (*Webb, supra*, at p. 518.)

In contrast to *Webb*, here the SART exam performed by Ritter did not constitute "private treatment" of Anna; the examination was initiated through a referral by the police in their investigation of a report of criminal conduct. And the prosecution had greater access to the records generated from the

exam than defendant since Ritter, in compliance with the law (see §§ 13823.11, subds. (a), (h)(4), 13823.7, subd. (a)), forwarded the report to law enforcement.[25] *Webb* therefore does not support the conclusion that either Ritter or the Center, in conducting the SART exam here, was not part of the "prosecution team" for purposes of establishing a *Brady* violation. (See *State v. Farris* (W.Va. 2007) 656 S.E.2d 121 [knowledge of Kentucky forensic psychologist retained by West Virginia police to interview the defendant's cousin and possible victim of sexual abuse imputed to prosecution under *Brady*].)

■ We thus conclude that, when it performed Anna's SART exam, including the collection of data necessary for the report, the Center at Valley Medical was, in fact, " 'acting on the government's behalf' " or " 'assisting the government's case.' " (*People v. Superior Court (Barrett), supra,* 80 Cal.App.4th at p. 1315, citations omitted.) In this instance, the personnel in the Center at Valley Medical responsible for conducting SART exams— namely, Ritter and Dr. Kerns—were part of the "prosecution team" for *Brady* purposes. (Cf. *Medina v. State* (2006) 122 Nev. 346 [143 P.3d 471] [holding that a duty of sexual assault nurse examiner is to gather evidence for possible prosecution and that nurse was thus a "police operative" for purposes of determining whether *Crawford v. Washington* (2004) 541 U.S. 36 [158 L.Ed.2d 177, 124 S.Ct. 1354] applied to victim's statements made to her].) Their knowledge of the existence of the SART video was thus imputed to the prosecution.

 3. *Whether SART video was material (prejudice)*[*]

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

 4. *Conclusion re* Brady *violation*

 We have carefully reviewed and considered the entire record in this case, including all of the trial testimony, exhibits, arguments of counsel, defend-

---

[25] In opposition to defendant's first new trial motion, the People argued that the videotaping of SART exams was not done by the Center at Valley Medical for any investigative purpose but was simply for the training of potential SART examiners. The People offered no evidentiary support for these claims. And it is readily apparent that the photos taken from the SART video here *were* used by Ritter and Dr. Kerns for the investigative purpose of arriving at their findings concerning Anna's SART exam. Thus, since the photos were used for an investigative purpose, it would make no sense to conclude (particularly where there is no evidence to support the conclusion) that the source material for the photos was not used for an investigative purpose.

[*]See footnote, *ante*, page 1457.

ant's two new trial motions, the People's oppositions thereto, the SART video and additional photographs submitted by the defense in connection with the first new trial motion and reviewed in camera by the trial court, and the court's lengthy order on the first new trial motion. We cannot uphold the trial court's conclusion that there was no *Brady* error.

The SART video was favorable to the defense. And it constituted suppressed evidence under *Brady*, because the Center at Valley Medical was part of the "prosecution team." The determination of whether defendant established the third element, namely, the materiality of the SART video under *Brady*, boils down to an overall assessment of whether, giving full consideration of the evidence presented at trial, the suppression of the SART video " 'undermines confidence in the outcome of the trial.' " (*Kyles, supra,* 514 U.S. at p. 434, quoting *Bagley, supra,* 473 U.S. at p. 678.) This, we believe, is *something more* than a conclusion that the outcome *may have been different* had the SART video been available, but *something less* than defendant's being required to "demonstrate that after discounting the inculpatory evidence in light of the [SART video], there would not have been enough left to convict." (*Kyles, supra,* at pp. 434–435.) Here, evaluating the potential impact of the omitted SART video in light of the entire record, our confidence in the outcome of the trial has been undermined by the suppression of this evidence by the prosecution. This determination is largely based upon the relative weakness (*sans* medical evidence) of the prosecution's case, coupled with the unfairness to defendant in his being required to respond to medical testimony with limited and inferior photos when far superior and numerous photographic evidence in the form of the SART video should have been made available to him.

We are mindful that the purpose of the *Brady* rule is "to ensure that a miscarriage of justice does not occur." (*Bagley,* 473 U.S. at p. 675, fn. omitted.) Based upon our conclusion that defendant established the requisite three elements, we find that the trial court erred by denying defendant's first motion for new trial made on the basis of violation of the *Brady* rule.[35]

---

[35] Because of this conclusion, we need not address defendant's remaining contentions of error. (See *People v. Jenkins* (2000) 22 Cal.4th 900, 980, fn. 12 [95 Cal.Rptr.2d 377, 997 P.2d 1044] [where Supreme Court held that suppression motion was properly denied based on third party consent, it declined to consider other claimed justifications for such denial].)

## DISPOSITION

The judgment is reversed and remanded for a new trial.

Mihara, Acting P. J., and McAdams, J., concurred.

Respondent's petition for review by the Supreme Court was denied September 10, 2008, S164724.