Filed 3/30/15  In re K.H. CA1/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| In re K.H., a Person Coming Under the Juvenile Court Law. | |
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>K.H.,<br><br>        Defendant and Appellant. | A140520<br><br>(Contra Costa County<br> Super. Ct. No. J1101458) |

This is an appeal from a jurisdictional order in juvenile criminal proceedings involving the commission by minor, K.H., of robbery enhanced for use of a firearm.[1] Several issues are raised on appeal, including issues relating to the juvenile court's decision to proceed with trial after minor absconded, the prosecution's delayed disclosure of a surveillance videotape that captures the victim fleeing into a market a few blocks from the robbery, the admission of a field identification of minor in which he was the sole suspect presented for viewing, the sufficiency of the evidence to support the facts that minor perpetrated the crime and used a firearm, and the juvenile court's imposition of certain time restrictions on defense counsels' closing arguments.  For reasons set forth below, we affirm.

---

[1]        Minor is one of three co-responsibles in these proceedings.

## FACTUAL AND PROCEDURAL BACKGROUND

On April 16, 2013, a juvenile delinquency petition was filed pursuant to Welfare and Institutions Code section 602, alleging that minor committed a robbery in violation of Penal Code section 211, with use of a firearm in violation of Penal Code section 12022.53, subdivision (b).[2] Minor denied these allegations, and a contested jurisdictional hearing was scheduled. The following evidence was revealed at this hearing, which began on September 10, 2013 and lasted over a week.

On the afternoon of April 12, 2013, C.E., the 13-year-old victim in this case, was visiting the City of Richmond Recreation Center with a friend. The two boys left the center in the early evening and joined a group of about 15 older youths that had congregated at a nearby dead-end street. Suddenly, the victim was "blind-sided" by a punch to the face. He did not see who punched him. He then fell to the ground, where he found himself being beaten by several youths at once. One attacker, whose face was obscured by a Verizon Wireless mask or bandana, lifted his black GAP hooded sweatshirt to reveal a gun. This youth then told the victim: "Give it up," or "give up your stuff," while another youth took his Gucci prescription eyeglasses, jacket, cell phone and a small sum of money from his pocket.

At this point, someone intervened to help the victim to his feet, advising him he had "10 seconds" to flee. The victim took off running, under the impression that he was being followed. A few blocks later, the victim entered Mike's Market on Bissell Avenue, where he dashed behind the counter with a black eye, bleeding mouth and ripped shirt. He appeared distraught. An employee helped the victim call 911. The victim described his attackers to the dispatcher, noting that one of them wore a black GAP hooded sweatshirt. The victim stayed at the market until police arrived a short time later.

Officer Mitchell Peixoto, responding to the dispatch, entered Mike's Market to find a shaky, tearful victim hiding behind the counter. The victim was initially reluctant to speak to police for fear of being labeled a "snitch." However, he eventually agreed to

---

[2]      Unless otherwise stated, all statutory citations herein are to the Welfare and Institutions Code.

2

be interviewed, and Officer Peixoto walked him to the police vehicle in handcuffs so it would appear he was being arrested. The victim was then interviewed by Officer Peixoto for about two or three minutes in the back of the police vehicle, after which Officer Michael Brown was able to call in a more complete description of the suspects.

Eventually, several suspects were located at various locations near the crime scene.[3] The victim agreed to participate in field identification procedures, and was driven by Officer Brown to two different locations after being admonished that a person's inclusion in a line-up was not an indication of guilt. At the first location, the victim identified A.H., one of two other co-responsibles in this case, as one of his attackers.[4] Two other suspects who were also placed in the line-up were released after minor failed to identify them as his attackers. At the second location, minor, who had been stopped a few blocks from the crime scene, was presented to the victim in a one-person show-up. Immediately upon arriving at the second location, and before the police car had even stopped, the victim spontaneously identified minor from about 60 feet away as the robber who had revealed a gun underneath his black GAP hooded sweatshirt.[5]

Although minor was not wearing the black GAP hooded sweatshirt during the field identification procedure, he was later photographed after his arrest wearing the sweatshirt and a Verizon Wireless bandana around his neck. No gun was ever recovered.

---

[3] Officer Bashar Zeidan testified that he was dispatched to 15th and Bissell Streets based upon a call that four to six people had committed a robbery. Officer Zeidan was told one of these people was a 15-year-old Black male, armed and wearing a black GAP hooded sweatshirt. Before arriving at the designated address, Officer Zeidan saw three Black minors walking on Marina Way. Upon seeing the officer, the minors ran northbound. Officer Zeidan made a U-turn to pursue them. After momentarily losing sight of the minors, Officer Zeidan found them again a short time later, and was able to detain two of the three, one of which was co-responsible, A.H.

[4] In a subsequent interview, minor stated that A.H. was the person who punched him in the face during the robbery.

[5] The victim later identified the third co-responsible, P.B., in a photographic line-up at the police station.

However, upon being transported to jail by Officer Mark Hall, minor spontaneously stated: "I can't believe we are the only two who got arrested."

At trial, the victim again identified minor as the perpetrator of the robbery who possessed a gun. The victim was familiar with minor, knowing him by the nickname, Sharry-Bo, and had seen him on the evening in question standing with a group of boys near the crime scene. The victim acknowledged having vision problems that made objects and people appear blurry without his prescription eyeglasses, which were taken from him during the robbery.

To defend against the allegations that he perpetrated the robbery, and did so with use of a real firearm, minor offered the testimony of forensic science consultant and firearm expert, James Norris. Norris explained that a real firearm is "a device that can fire a cartridge that contains smokeless powder and a primer and a bullet type projectile" that "functions by the explosive force of . . . nitrocellulose powder burning." Imitation firearms, to the contrary, include pellet/BB guns, cap guns, and Airsoft weapons, which are frequently manufactured to replicate real firearms and often cannot be distinguished from real firearms by ordinary observers. While Airsoft weapons sold in California are legally required to have an orange tip at the muzzle, their owners frequently paint over and/or remove the orange paint. Airsoft weapons, which are manufactured as replicas of particular firearm models, are significantly easier to acquire than real firearms because they do not require background checks or paperwork.

On September 25, 2013, following closing arguments, the juvenile court sustained the allegations against minor in the section 602 petition. On December 2, 2013, minor was placed in the Contra Costa County YOTP program for 84 months or until age 21, with credit for 12 months, 11 days served. A timely notice of appeal was filed on December 9, 2013.

## DISCUSSION

Minor raises the following arguments on appeal: (1) the trial court erred by proceeding with trial in his absence after he absconded; (2) the trial court further erred by failing to dismiss the case or to order a mistrial after the prosecution failed to timely

4

disclose a surveillance videotape recorded at Mike's Market, the store in which the victim ran for safety after the crime; (3) his attorney provided ineffective assistance of counsel by failing to discover this videotape prior to trial; (4) the field identification of minor by the victim should have been suppressed because the procedure used was unduly suggestive and unreliable; (5) defense counsel provided ineffective assistance by failing to object to admission of the field identification; (6) there was insufficient evidence to prove minor was the perpetrator of the robbery; (7) the trial court's firearm use enhancement was based on a misunderstanding of the law and lacked the support of substantial evidence; and (8) the trial court violated his constitutional rights to due process and effective assistance of counsel by granting the prosecutor one hour for summation, while requiring the attorneys for all three co-responsibles to share one hour of summation. We address each issue in turn below.

## I.     Proceeding with Trial in Minor's Absence.

Minor contends the trial court violated his constitutional and statutory rights to be present at trial when it proceeded with the contested jurisdictional hearing after he absconded.[6] According to minor, this error was structural in nature, requiring reversal. The prosecution, in turn, contends that minor, by absconding, knowingly and voluntarily forfeited his right to be present, and that, even if proceeding in his absence could be deemed error, it was in any event harmless. We begin with a recitation of the relevant facts, which are not disputed.

The contested jurisdictional hearing began September 10, 2013. On the morning of September 12, before the hearing had convened for the day, a deputy sheriff saw minor and another youth across the street from the courthouse "appear[ing] to be passing a substance between each other, like a cigarette, or marijuana or something." The deputy sheriff then saw the boys enter the courthouse and proceed to the juvenile courtroom. The deputy sheriff told the bailiff assigned to this courtroom what he had observed, and

---

[6]     Under section 679, a "minor who is the subject of a juvenile court hearing . . . is entitled to be present at such hearing."

5

the bailiff then relayed this information to the judge. After conferring with counsel in chambers, the juvenile court announced its intent to order minor to take a drug test. Defense counsel then sought and received permission to inform minor of the court's intended order. After being advised of the impending drug test, minor left the courtroom and failed to reappear, prompting the court to issue a bench warrant for his arrest. This warrant was recalled on November 12, 2013, at which time minor was ordered detained in the county jail pending the next hearing.[7] However, until that time, the proceedings continued in minor's absence after the court denied defense counsel's mistrial motion, explaining: "[Minor] cannot be the cause of his own mistrial by his conduct as contributing."

The parties agree that the correct legal principles are set forth in a First District Appellate decision, *In re Sydney M*. (1984) 162 Cal.App.3d 39 (*Sydney M*). This decision likewise involved a minor who voluntarily absented himself from a contested jurisdictional hearing, which the juvenile court then permitted to go forward in his absence. After rejecting the prosecution's argument that Penal Code section 1043 applies,[8] our appellate colleagues went on to explain that "[i]t does not follow, however, that a jurisdiction hearing which was begun in the juvenile's presence cannot continue when he or she voluntarily absents himself or herself. While it is certainly true that a minor subjected to the juvenile court system is entitled to fundamental due process and fairness (see Welf. & Insts. Code, § 702.5; [citations]), it is equally settled beyond question that a minor may be capable of knowingly and intelligently waiving his or her

---

[7]    Minor had already committed several probation violations, and a positive drug test would have been another violation.

[8]    Penal Code section 1043 provides in relevant part: "(a) Except as otherwise provided in this section, the defendant in a felony case shall be personally present at the trial. [¶] (b) The absence of the defendant in a felony case after the trial has commenced in his presence shall not prevent continuing the trial to, and including, the return of the verdict in any of the following cases: [¶] . . . [¶] (2) Any prosecution for an offense which is not punishable by death in which the defendant is voluntarily absent." (Pen. Code, § 1043, subds. (a), (b)(2).)

rights [citations], including the right to a jurisdiction hearing. (Welf. & Insts. Code, § 657; Cal. Rules of Court, rule 1351(f).)" (*Sydney M.*, *supra*, 162 Cal.App.3d at p. 48.)

The *Sydney M.* court thus ultimately held that "a minor who is the subject of a juvenile court hearing and who has a right, under . . . section 679, to be present at that hearing, may properly be found to have waived that right if the juvenile court finds a knowing and intelligent waiver, considering the minor's age and other relevant circumstances, including intelligence, education, experience, and ability to comprehend the meaning and effect of his or her acts. [Citations.] Stated another way, . . . section 679 simply requires that the state not do anything that would preclude the minor from being present and that if the minor is voluntarily absent, thereafter he or she cannot complain of the situation thus created; the minor cannot take advantage of his or her own wrong and stop the hearing simply by walking out." (*Sydney M.*, *supra*, 162 Cal.App.3d at pp. 48-49.)

Returning to our case, the parties' dispute centers around whether the juvenile court properly applied the principles set forth in *Sydney M.*, and whether, consistent with those principles, the facts support a finding that minor voluntarily and knowingly forfeited his constitutional right to be present at the jurisdictional hearing. Having reviewed the relevant record, we conclude the evidence was indeed sufficient to establish minor's voluntary and knowing forfeiture.

In reaching this conclusion, we find particularly significant the fact that minor was 18 years old – nearly an adult in the eyes of the law – when he absconded. Moreover, like the juvenile in *Sydney M.*, minor was an experienced participant in the juvenile justice system. Not only had minor previously been declared a ward of the court, he had also previously been found in violation of the terms of his probation. Finally, also similar to *Sydney M.*, minor was represented by competent counsel, who had, prior to the hearing, discussed with him the fact that he had the right to testify. (See *Sydney M.*, *supra*, 162 Cal.App.3d at p. 49 [concluding there was "ample evidence" supporting the court's finding that minor had voluntarily absconded where he had "extensive

7

experience" with the juvenile justice system and "clearly understood that he had a right to be present throughout the jurisdiction hearing"]).

Moreover, while minor suggests that compensation should be made for his "developmental immaturity," we see no evidence in the record that his level of maturity or intelligence was so below average that he should be excused from the consequences of his voluntary decision to leave court rather than to submit to a drug test, with the known result that, upon leaving, he would miss trial.[9] On this record, the juvenile court acted within the scope of its discretion in proceeding with trial in minor's absence upon noting: "[H]e cannot be the cause of his own mistrial by his conduct as contributing."

Finally, given the substantial evidence of the knowing and voluntary nature of minor's forfeiture, we need not address minor's alternate contention that the juvenile court misapplied the law by failing to consider the relevant factors. Even were we to assume for the sake of argument that the juvenile court failed to consider all relevant factors (which, contrary to minor's suggestion, is not clear on this record), the court's ultimate decision to proceed with trial in minor's absence was appropriate. (*In re Natasha A.* (1996) 42 Cal.App.4th 28, 38 ["we review the lower court's ruling, not its reasoning; we may affirm that ruling if it was correct on any ground"].)

## II. The Prosecution's Untimely Disclosure of the Surveillance Videotape.

### A. Untimely Disclosure of Evidence.

Minor next challenges the trial court's decision-making with respect to the surveillance videotape recorded near Mike's Market, which the prosecution failed to disclose until the third day of trial. According to minor, the trial court's failure to declare a mistrial or dismiss the case in light of this untimely evidence violated his constitutional right to due process. (*Brady v. Maryland* (1963) 373 U.S. 83, 87 ["suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or

---

[9] The record reflects that, while minor was in a special education program, his lack of academic success was "primarily" a result of his "lack of attendance and behavioral problems in the classroom," rather than any overt mental issues.

bad faith of the prosecution"] ["*Brady*"]); see also *People v. Uribe* (2008) 162 Cal.App.4th 1457, 1475 ["A good faith failure to disclose, irrespective of the presence of a defense request for the materials, may constitute the 'suppression' necessary to establish a *Brady* violation"].) We begin with a recitation of the facts relevant to minor's so-called *Brady* claim before conducting an independent review to decide whether such error occurred. (*People v. Salazar* (2005) 35 Cal.4th 1031, 1042.)

On September 11, 2013, the second day of trial, counsel for one of the co-responsible minors, P.B., called as a witness a boy named B.P., who testified that, on the day in question, he and the co-responsibles were hanging out together at the corner of 15th Street and Chanslor Street. According to B.P., after about 10 or 15 minutes, the four youths went to Mike's Market to buy candy, at which point they saw the victim approaching the store with a bloody mouth and scratches and welts on his face.

On September 12, 2013, the next day of trial, the prosecutor notified the court that a surveillance videotape from a camera located at Mike's Market had been found, and that information on this videotape directly contradicted B.P.'s testimony from the previous day. Specifically, contrary to B.P.'s testimony, this videotape shows the victim racing into Mike's Market, but does not show the four youths entering the market to buy candy. The videotape was then given to all three defense counsel for their review. Minor's counsel, in particular, objected to admission of the videotape, noting the prejudice arising from its late discovery, including prejudice arising from the fact that the victim had already testified. In response, the prosecutor explained that, until B.P. provided an alibi for the co-responsibles in his testimony, she had not known "there was any relevant evidence coming out of Mike's Market . . . ." However, after B.P. testified, she talked to a detective who revealed to her that there may be a City of Richmond surveillance camera in the vicinity of Mike's Market. After their conversation, the detective was able to confirm the existence of such camera, and to then retrieve the camera's footage for the relevant time period. Thus, as the prosecutor told the court: "[T]his [footage] only became relevant to this case after [B.P.] came into court and testified as he did. So therefore, I don't – I don't consider this late discovery, I consider

9

it impeachment. The problem is, it completely impeaches what [] [B.P.] said. It shows absolutely what [the victim] said and not what [B.P.] said."

The juvenile court ultimately denied defense counsel's motion for mistrial, noting that, while the prosecution's delay in producing the videotape may have been negligent, it was not intentional misconduct. However, the juvenile court did order the following curative measures. First, the court appointed counsel for B.P. and, when B.P. was called back to the witness stand, he invoked his Fifth Amendment right to not testify. The juvenile court thereafter struck in its entirety B.P.'s September 11, 2013 testimony. It was also agreed that the prosecution would make available without a subpoena the police official with access to the City of Richmond's camera at Mike's Market. And, finally, the court granted a 10-day continuance during the hearing to enable counsel to review the videotape, conduct any necessarily investigation, and prepare for the hearing. After the court had taken these steps, the videotape was admitted into evidence without objection.

With respect to minor's contention on appeal that the juvenile court reversibly erred by not declaring a mistrial or dismissing his case based upon the prosecution's tardy disclosure of the Mike's Market surveillance videotape, the governing law is well-established. " '[T]he prosecution has no *general duty* to seek out, obtain, and disclose all evidence that might be beneficial to the defense' [citation], since 'the Constitution is not violated every time the government fails or chooses not to disclose evidence that might prove helpful to the defense.' [Citation.] Rather, a violation occurs " 'only if there is a reasonable probability that, had [it] been disclosed to the defense, the result . . . would have been different.' [Citations.] The requisite 'reasonable probability' is a probability sufficient to 'undermine[] confidence in the outcome' on the part of the reviewing court. (*In re Sassounian* (1995) 9 Cal.4th 535, 544.)" [¶] " '[Moreover,] [i]n general, impeachment evidence has been found to be material where the witness at issue "supplied the only evidence linking the defendant(s) to the crime," *United States v. Petrillo*, 821 F.2d 85, 90 (2d Cir. 1987); *see also Giglio v. United States*, 405 U.S. [150,] 154-155 [31 L.Ed.2d 104, 92 S.Ct. [763,] 766 [(1972)] (*Brady* violation found where government failed to disclose promise not to prosecute cooperating witness on whom government's

10

case against defendant "almost entirely" depended), or where the likely impact on the witness's credibility would have undermined a critical element of the prosecution's case, *see United States v. Badalamente*, 507 F.2d 12, 17-18 (2d Cir. 1974) (same re nondisclosure of "hysterical" letters that would have had "powerful adverse effect" on witness's credibility, where that credibility was " 'crucial to the determination of [the defendant's] guilt or innocence'); *cert. denied*, 421 U.S. 911 [43 L.Ed.2d 776, 95 S.Ct. 1565 (1975)]." (*People v. Salazar, supra,* 35 Cal.4th at pp. 1049-1050.)

Thus, "[a]lthough the term '*Brady* violation' is often broadly used to refer to any failure on the part of the prosecution to disclose favorable information to the defense, a true violation occurs only if three components coexist:  'The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued.' (*Strickler v. Greene* (1999) 527 U.S. 263, 281-282 . . . .)" (*People v. Uribe, supra,* 162 Cal.App.4th at p. 1474.)

"Although most reviewing courts called upon to determine the existence of a *Brady* violation do so following a trial and conviction, the same standard applies when the issue arises pretrial: '[T]he prosecutor will not have violated his constitutional duty of disclosure unless his omission is of sufficient significance to result in the denial of the defendant's right to a fair trial.' (*United States v. Agurs* (1976) 427 U.S. 97, 108 [49 L.Ed.2d 342, 96 S.Ct. 2392].)" (*People v. Superior Court* (*Meraz*) (2008) 163 Cal.App.4th 28, 51 [*Meraz*].)[10]

Returning to the matter at hand, minor's claim of *Brady* error is based upon the following reasoning. First, minor contends the Mike's Market surveillance videotape contained material information contradicting testimony from both the victim and Officer

---

[10]     We conclude this same standard of review also applies where, as here, the issue of whether a *Brady* violation has occurred arises during trial.

Peixoto,[11] as well as defense witness B.P., such that the prosecution's delayed disclosure of it "undermine[d] faith in the fairness of the trial and the reliability of [its] outcome." Second, with respect to the videotape's impact on B.P.'s credibility, minor contends "[the videotape's] belated production and admission into evidence may well have left the trial court with the impression that the three juvenile defendants had attempted to mislead the court with their friend's perjured alibi testimony." Finally, minor contends the purported *Brady* error was structural in nature, such that the resulting prejudice to him should be presumed. We reject this reasoning on several grounds, even assuming for the sake of argument that information on the videotape impeaches the victim or Officer Peixoto.

First and foremost, we do not agree the information on the videotape was in fact suppressed by the prosecution within the meaning of *Brady*. As explained by our appellate colleagues in *Meraz,* a case involving the prosecution's pretrial, yet nonetheless untimely, disclosure of evidence: "Our Supreme Court has observed that 'evidence that is presented at trial is not considered suppressed, regardless of whether or not it had previously been disclosed during discovery. [Citations.]' (*People v. Morrison* (2004) 34 Cal.4th 698, 715 [21 Cal.Rptr.3d 682, 101 P.3d 568].) It would seem necessarily to follow that information disclosed in advance of trial is not considered suppressed, even assuming it should have been given to the defense earlier. On the other hand, we recognize that "*[d]isclosure, to escape the Brady sanction, must be made at a time when the disclosure would be of value to the accused.* [Citation.]' [Citation.]" (*Meraz, supra,* 163 Cal.App.4th at p. 51 [italics added].)

Here, the record reflects that the prosecution's disclosure of the Mike's Market videotape was made at a time when this evidence remained of value to the defense team. Indeed, upon its disclosure, just a few days into trial, the juvenile court granted minor a 10-day continuance to enable him to review and effectively utilize the information on the videotape during trial. Moreover, while minor complains that the victim had already

---

[11] According to minor, the videotape calls into question the victim's testimony that he was chased or followed to Mike's Market after the crime, as well as Officer Peixoto's testimony that he interviewed the victim after being dispatched to the market.

12

testified at trial prior to disclosure of the videotape and, thus, could not be impeached with this evidence, he neglects the fact that the victim had been excused from the witness stand subject to the parties' right to recall him. Minor therefore could have recalled the victim to confront him with evidence revealed by the videotape, yet he declined to do so. As such, any claim that the prosecution's late disclosure of the videotape prevented minor's effective cross-examination of a key witness rings hollow. The record does not demonstrate that the defense was in any way precluded from effectively pursuing its desired strategy and tactics at trial once the videotape was disclosed.

Second, we reject minor's claim to have been prejudiced by the juvenile court's failure to declare a mistrial on *Brady* grounds in light of the fact that the late-disclosed videotape contradicted the alibi testimony of defense witness B.P. While disclosure of the videotape was relevant to minor's trial strategy given what it revealed about B.P.'s alibi testimony, minor's prejudice argument ignores several measures taken by the juvenile court to address any undue harm to his case engendered by the untimely disclosure. These measures included appointing counsel for B.P., who then invoked the Fifth Amendment when recalled, and, ultimately, striking B.P.'s testimony in its entirety. Minor suggests the late disclosure and subsequent admission of the videotape "may well have left the trial court with the impression that the three juvenile defendants had attempted to mislead the court with their friend's perjured alibi testimony." However, we decline to assume the juvenile court ignored its own order to strike B.P.'s testimony by thereafter relying upon the stricken testimony to discredit minor or to otherwise support a finding of guilt. It is a fundamental rule of our legal system that a court is presumed to follow the law in the absence of evidence to the contrary. (*In re Julian R.* (2009) 47 Cal.4th 487, 499 [reviewing courts must presume the lower court was aware of and followed the applicable law].) Thus, in light of the juvenile court's curative measures following admission of the videotape, the court's subsequent failure to call a mistrial was not prejudicial error.

Finally, with respect to minor's related claim that information on the videotape impeached the victim's testimony that he was chased or followed to Mike's Market after

13

the crime and Officer Peixoto's testimony that he interviewed the victim in his police car after being dispatched to the market, even if true, "[t]he mere possibility that an item of undisclosed information might have helped the defense, or might have affected the outcome of the trial, does not establish "materiality" in the constitutional sense." [Citation.]' [Citations.]" (*Meraz, supra*, 163 Cal.App.4th at p. 52.) "As we have described it in terms of posttrial analysis of nondisclosure, ' "[m]ateriality … requires more than a showing that the suppressed evidence would have been admissible [citation], that the absence of the suppressed evidence made conviction 'more likely' [citation], *or that using the suppressed evidence to discredit a witness's testimony 'might have changed the outcome of the trial'* [citation]. A defendant instead 'must show a "reasonable probability of a different result." ' [Citation.]' [Citation.]" (*Meraz, supra*, 163 Cal.App.4th at p. 52 [italics added].) In this case and on this record, there is no reasonable probability of a different result. Indeed, as the prosecution aptly notes, the robbery in this case occurred blocks away from Mike's Market on a dead-end street near the recreation center. Thus, whether the victim subsequently raced to the market alone seeking refuge or was chased there, and whether he was interviewed by Officer Peixoto at the market in a police vehicle or elsewhere, the fact remains the victim identified minor, a person he was familiar with and knew by the name of Sharry-Bo, as the person at the crime scene in the black GAP hooded sweatshirt who robbed him with use of a firearm.[12] Accordingly, minor's claim of *Brady* error must fail.

## B.     Effectiveness of Counsel.

Minor also raises the related contention that he was denied effective assistance of counsel due to his attorney's failure to independently discover the videotape from Mike's Market when preparing for trial. This governing law is also well-established.

To prevail on a claim of ineffective assistance of counsel, the defendant must prove more than a failure by counsel to undertake a particular strategy or investigation.

---

[12]     The sufficiency of the evidence to support the juvenile court's findings that minor committed the robbery with use of a real firearm are discussed below in Sections IV and V.

Rather, "defendant must show counsel's performance fell below a standard of reasonable competence, and that prejudice resulted." (*People v. Anderson* (2001) 25 Cal.4th 543, 569.) In meeting this standard, the defendant must overcome a strong presumption that counsel's conduct was sound trial strategy or otherwise within the wide range of reasonable professional assistance. (*People v. Burnett* (1999) 71 Cal.App.4th 151, 180; *People v. Bunyard* (1988) 45 Cal.3d 1189, 1215.) Moreover, "prejudice" in this context occurs only where defense counsel's deficient performance " 'so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result.' " (*People v. Kipp* (1998) 18 Cal.4th 349, 366, quoting *Strickland v. Washington* (1984) 466 U.S. 668, 686.) If "a defendant has failed to show that the challenged actions of counsel were prejudicial, a reviewing court may reject the claim on that ground without determining whether counsel's performance was deficient." (*People v. Kipp, supra,* 18 Cal.4th at p. 366.)

Applying these principles to the facts at hand, we conclude minor has established neither deficient performance by counsel nor prejudice. With respect to the former point, as the prosecutor pointed out when explaining to the court why she failed to disclose the Mike's Market videotape earlier, the prosecution was focused on the events surrounding the actual robbery, which occurred at a different site and at an earlier time, rather than the events surrounding the victim's subsequent retreat to the market in search of safety and assistance. The same could be true of defense counsel – to wit, that counsel was less concerned with the victim's retreat to, and 911 call from, the market, and more concerned with whether the victim correctly identified minor as the perpetrator of the robbery on Chanslor Street near the recreational center. As minor acknowledges in his reply brief, his counsel presented two complementary defenses at trial, one, that he was not the person who displayed the gun to the victim *during the robbery* and, two, the object displayed *during the robbery* may not have been a real firearm. Given the reasonable tactical decision by defense counsel to focus on the identity of the perpetrator of the crime at the crime scene, counsel's failure to affirmatively discover the existence of the Mike's Market videotape – recorded minutes after the crime at a different location –

15

cannot be deemed constitutionally deficient performance. (*People v. Carter* (2003) 30 Cal.4th 1166, 1211 [unless appellant proves otherwise, we presume "counsel's performance fell within the wide range of professional competence and that counsel's actions and inactions can be explained as a matter of sound trial strategy"].)

And finally, even assuming for sake of argument that defense counsel's performance could be labeled deficient, we could not conclude such performance caused any prejudice to minor. As explained above, minor was granted a 10-day continuance after the prosecution disclosed the videotape just a few days after the start of trial, permitting defense counsel ample time to investigate and develop an appropriate strategy with respect to any information contained therein. (*Strickland v. Washington, supra,* 466 U.S. at p. 694 [reversal is warranted only if appellant proves a reasonable probability that, but for counsel's deficient performance, he would have achieved a different result].)

## III.    The Field Identification of Minor.

### A.    Admissibility of the Identification.

Minor contends the juvenile court violated his due process rights by failing to *sua sponte* suppress the victim's field identification of him given the undue suggestiveness and unreliability of the identification procedure utilized. On appeal, we independently review a trial court's decision to admit this evidence to determine whether the procedure was unduly suggestive. (*People v. Gonzalez* (2006) 38 Cal.4th 932, 942; *People v. Kennedy* (2005) 36 Cal.4th 595, 608-609.) The appellant then has the burden to show on appeal that the identification procedure was unreliable under a totality of the circumstances. (*People v. Ochoa* (1998) 19 Cal.4th 353, 412.) Thus, " '[t]he issue of constitutional reliability depends on (1) whether the identification procedure was unduly suggestive and unnecessary [citation]; and if so, (2) whether the identification itself was nevertheless reliable under the totality of the circumstances, taking into account such factors as the opportunity of the witness to view the criminal at the time of the crime, the witness's degree of attention, the accuracy of his prior description of the criminal, the level of certainty demonstrated at the confrontation, and the time between the crime and the confrontation [citation]. If, and only if, the answer to the first question is yes and the

16

answer to the second is no, is the identification constitutionally unreliable.' (*People v. Gordon* (1990) 50 Cal.3d 1223, 1242 [270 Cal.Rptr. 451, 792 P.2d 251].) In other words, '[i]f we find that a challenged procedure is not impermissibly suggestive, our inquiry into the due process claim ends.' (*United States v. Bagley* (9th Cir. 1985) 772 F.2d 482, 492.)" (*People v. Ochoa, supra*, 19 Cal.4th at p. 412.)

We turn first to the issue of whether the identification procedure was unduly suggestive. " 'A procedure is unfair which suggests in advance of identification by the witness the identity of the person suspected by the police.' [Citation.]" (*People v. Ochoa, supra*, 19 Cal.4th at p. 413.) "Moreover, there must be a 'substantial likelihood of irreparable misidentification' under the ' " ' "totality of the circumstances" ' " ' to warrant reversal of a conviction on this ground. [Citation.]" (*People v. Cunningham* (2001) 25 Cal.4th 926, 990.)

Here, minor's claim of undue suggestiveness is based upon the fact that the identification procedure employed by police officers in his case was a one-person show-up, meaning minor was the lone suspect presented to the victim at the time of the identification. According to minor, this procedure is "intrinsically suggestive" because the victim's image of the person identified at the show-up permanently replaces the victim's mental image of the actual perpetrator. In making this claim, minor acknowledges California Supreme Court authority holding that one-person show-ups may in fact be appropriate if, under the totality of circumstances, there is no unfairness demonstrated. (*People v. Clark* (1992) 3 Cal.4th 41, 136 ["a one- person showup or corporeal lineup, may pose a danger of suggestiveness, but such lineups or showups are not necessarily or inherently unfair. [Citations.] Rather, all the circumstances must be considered"].) We thus must look more closely at the relevant facts to determine whether, based upon the totality of circumstances, the procedure employed against minor was fair.

The same evening as the robbery, Officer Brown asked the victim to participate in one or more in-field lineups involving possible suspects. After the victim agreed, Officer Brown read him an admonishment instructing that a person's detention and participation in a lineup did not mean that person had committed any crime. Officer Brown then drove

17

the victim to 17th and Chanslor Streets to view a detained suspect.[13]  Upon their arrival, and before the police vehicle could stop, the victim spontaneously told the officer that the detained suspect – to wit, minor, who was standing, handcuffed, about 50 feet from the vehicle – was the person who had shown him the gun in his waistband during the robbery.  Specifically, the victim told Officer Brown: "[Minor] may not have a gun now but he had one.  I thought he was going to shoot me."  The victim then confirmed that he was "a hundred percent sure" minor was the perpetrator of the robbery who had carried the gun.

Having considered these undisputed facts, we conclude reversal of the juvenile court's judgment on the basis of the one-person show-up procedure is unwarranted because the requisite "substantial likelihood of irreparable misidentification under the totality of the circumstances" does not exist.  (See *People v. Cunningham, supra,* 25 Cal.4th at p. 990 [internal quotation marks omitted].)  Not only did the victim spontaneously identify minor, he then confirmed to the officer that he was completely certain of his identification.  While minor points out that the victim had acknowledged having vision problems, the victim at no point stated or even suggested that he could not see minor well enough to identify him as the perpetrator of the robbery with the gun.  Moreover, at the time during the robbery  when the perpetrator pulled up his sweatshirt to reveal the gun, the victim had in fact been wearing his glasses.[14]  The victim also confirmed later that, even before the robbery, he was familiar with minor, who he knew

---

[13]  Before the victim was driven to 17th Street and Chanslor Street, where minor was detained, Officer Brown drove him to Marina Way and Chanslor Street, where three other detained suspects were presented for identification.  At this location, the victim identified A.H., one of the co-responsible minors involved in this case, as the person who had punched him in the face.  Victim did not identify the other two suspects as the perpetrators of the robbery, thereby showing his understanding of and adherence to Officer Brown's admonishment that the lineup participants were not necessarily the crime's perpetrators.  These two suspects were subsequently released.

[14]  The victim told police before the field identification took place that the perpetrator was wearing a black GAP hooded sweatshirt and a Verizon Wireless bandana.  Consistent with the victim's description, minor was photographed after his arrest wearing these items.

18

by the nickname Sharry-Bo and had seen shortly before the robbery standing nearby with a group of boys.  In light of the victim's certainty that minor was the perpetrator, the absence of any indication that the victim had trouble seeing minor during the robbery or the identification, and his prior familiarity with minor, we have no trouble concluding the identification procedure in this case was fair based upon the totality of circumstances.  Accordingly, this evidence was properly admitted.  (See *People v. DeSantis* (1992) 2 Cal.4th 1198, 1222 [appellant must prove "unfairness as a demonstrable reality, not just speculation"]; see also *In re Carlos M*. (1990) 220 Cal.App.3d 372, 386 [the mere fact that the defendant was handcuffed during a field identification does not establish the identification procedure was unduly suggestive].)

### B.    Effectiveness of Counsel.

Minor again raises the argument that he received ineffective assistance from counsel, this time due to his attorney's failure to move to suppress this field identification.  And we again reject his argument.  As mentioned above, regardless of whether defense counsel provided deficient legal assistance to a particular client, if "[the] defendant has failed to show that the challenged actions of counsel were prejudicial, a reviewing court may reject the claim on that ground without determining whether counsel's performance was deficient."  (*People v. Kipp, supra,* 18 Cal.4th at p. 366.) This rule disposes of minor's claim.  Simply put, because there was no substantial likelihood in this case of irreparable misidentification under the totality of the circumstances, there is no basis for minor's claim to have been prejudiced by his counsel's failure to move to suppress the identification.

Accordingly, the identification procedure employed in this case provides no basis for reversing the jurisdictional order, whether viewed for admissibility or effectiveness of assistance of counsel.

## IV.    Substantial Evidence Identifying Minor as the Robbery's Perpetrator.

Minor next contends that, even if the victim's field identification of him was properly admitted (we have concluded it was), the evidence in the record is nonetheless

insufficient to establish that he was the perpetrator of this robbery. The finding that minor was in fact the perpetrator rested on the theory that he aided and abetted the other two youths who are co-responsibles in this matter. Under California law, a person who aids and abets a crime is guilty of the crime as a principle in the crime. (Pen. Code, § 31; see also *People v. Beeman* (1984) 35 Cal.3d 547, 551 ["Sound law, embodied in a long line of California decisions, requires proof that an aider and abettor rendered aid with an intent or purpose of either committing, or of encouraging or facilitating commission of, the target offense"].)

"On appeal we review the whole record in the light most favorable to the judgment to determine whether it discloses substantial evidence—that is, evidence that is reasonable, credible, and of solid value—from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. [Citations.] The standard of review is the same in cases in which the People rely mainly on circumstantial evidence. [Citation.] 'Although it is the duty of the jury to acquit a defendant if it finds that circumstantial evidence is susceptible of two interpretations, one of which suggests guilt and the other innocence [citations], it is the jury, not the appellate court which must be convinced of the defendant's guilt beyond a reasonable doubt. " 'If the circumstances reasonably justify the trier of fact's findings, the opinion of the reviewing court that the circumstances might also reasonably be reconciled with a contrary finding does not warrant a reversal of the judgment.' " [Citations.]' [Citation.] ' "Circumstantial evidence may be sufficient to connect a defendant with the crime and to prove his guilt beyond a reasonable doubt." ' " (*People v. Stanle*y (1995) 10 Cal.4th 764, 792-793.)

Here, the record establishes the following facts supportive of the juvenile court's finding that minor was the person who committed the robbery in question. The victim testified that, after one of the co-responsibles punched him in the fact, forcing him to the ground, the perpetrator lifted a black hooded GAP sweatshirt to reveal a gun at his hip. After another co-responsible socked the victim while he was on the ground, at least one of the perpetrators went through his pockets and took his jacket, phone, and a few dollar in cash. The victim suffered a black eye, bloody mouth and ripped shirt before running a

few blocks away to Mike's Market, where he found safety and was assisted in calling 911. The same evening, after police were dispatched to the area with the victim's description of the suspects, the victim participated in field identification procedures involving several youths detained in the area by officers. In one of these procedures, the victim identified minor as the perpetrator. Specifically, before even leaving the police car, the victim spontaneously identified minor with "a hundred percent" certainty. In addition, the victim identified minor again at trial and confirmed having prior familiarity with minor, knowing him by the nickname, Sharry-Bo.

Adding further support for the reliability of his field identification, the victim told police before the procedure that the perpetrator was wearing a black GAP hooded sweatshirt and a Verizon Wireless bandana. Minor, in turn, was photographed after his arrest wearing these same items of clothing. And, finally, minor's own actions post-arrest tend to show consciousness of guilt. Upon arriving at the Hall of Justice after being transported to jail by Officer Hall, minor spontaneously stated: "I can't believe we are the only two who got arrested."

In light of this substantial evidence that minor aided and abetted the robbery in question, we reject his evidentiary challenge without further discussion. (*People v. Johnson* (1980) 26 Cal.3d 557, 576 [" 'The test on appeal is whether substantial evidence supports the conclusion of the trier of fact, not whether the evidence proves guilt beyond a reasonable doubt. [Citation omitted.] The appellate court must determine whether a reasonable trier of fact could have found the prosecution sustained its burden of proving the defendant guilty beyond a reasonable doubt' "].) The court's finding stands.

## V. Substantial Evidence of Minor's Firearm Use.

Minor raises a similar evidentiary challenge to the juvenile court's firearm sentence enhancement. According to minor, this firearm enhancement must be vacated because it was based on the juvenile court's misapprehension of law and was not based on substantial evidence. More specifically, minor contends that, while the evidence may have demonstrated his use of a gun during the robbery, it did not demonstrate this gun was a "real firearm" within the meaning of Penal Code section 12022.53, subdivision (b),

21

as opposed to a fake or replica gun.[15]  In so contending, minor points to the testimony of defense expert, James Norris, explaining that certain types of guns, including BB, pellet and Airsoft guns, are manufactured as replicas of particular models of real firearms and often cannot be distinguished from real firearms by ordinary observers.[16]

The general law governing challenges to the sufficiency of evidence has already been set forth.  (p. 20, *ante*.)  In addition, both parties acknowledge case law applying the sufficiency-of-the-evidence standard to an order, like ours, imposing a firearm sentencing enhancement pursuant to Penal Code section 12022.53, subdivision (b).  In *People v. Monjaras* (2008) 164 Cal.App.4th 1432 (*Monjaras*), the reviewing court considered the precise argument raised herein – to wit, whether there was substantial evidence to support a firearm enhancement where there was no direct evidence that the gun possessed by the defendant was a real firearm as opposed to a toy gun.  In holding that the evidence was indeed sufficient to withstand such a challenge, the appellate court employed the following analysis:

"The fact that an object used by a robber was a 'firearm' can be established by direct or circumstantial evidence. (See *People v. Rodriguez* (1999) 20 Cal.4th 1, 12 [82 Cal.Rptr.2d 413, 971 P.2d 618; [citations].) [¶]  Most often, circumstantial evidence

---

[15]    Penal Code section 12022.53, subdivision (b) provides that "any person who, in the commission of a felony specified in subdivision (a) [including robbery], personally uses a firearm, shall be punished by an additional and consecutive term of imprisonment in the state prison for 10 years. The firearm need not be operable or loaded for this enhancement to apply."  For purposes of this section, "firearm" means "a device, designed to be used as a weapon, from which is expelled through a barrel, a projectile by the force of any explosion or other form of combustion." (Pen. Code, § 16520, subd. (a).) To the contrary, toy guns or guns such as pellet or BB guns do not qualify as a "firearm" because they use the force of air pressure, gas pressure, or spring action to expel a projectile rather than an explosion or other form of combustion.  (*Id.*; see also *People v. Hajek and Vo* (2014) 58 Cal.4th 1144, 1195.)

[16]    Norris explained that imitation guns are frequently made to resemble real firearms and, while Airsoft weapons sold in California are legally required to have an orange tip at the muzzle, their owners frequently paint over and/or remove the orange tip.  Airsoft weapons are significantly easier to acquire than real firearms because they do not require background checks or paperwork.

alone is used to prove the object was a firearm. This is so because when faced with what appears to be a gun, displayed with an explicit or implicit threat to use it, few victims have the composure and opportunity to closely examine the object; and in any event, victims often lack expertise to tell whether it is a real firearm or an imitation. And since the use of what appears to be a gun is such an effective way to persuade a person to part with personal property without the robber being caught in the act or soon thereafter, the object itself is usually not recovered by investigating officers. [¶] . . . [¶] "Here, defendant demanded of the female victim, 'Bitch, give me your purse,' then pulled up his shirt and displayed the handle of a black pistol tucked in his waistband. The victim, who had seen guns before but had never handled one, testified she immediately saw that the pistol looked like a gun, and it made her scared. She 'assumed' the pistol was 'real' and handed over her pocketbook. When asked by defendant's trial attorney what the pistol was made of, the victim said: 'Probably metal because—I don't know. Wasn't wood, wasn't plastic. I don't know if it was plastic or metal. . . . He don't show it to me. He just do 'this' to me [pulled up his shirt and displayed the pistol].' The victim then conceded that she could not say for certain whether it was 'a toy or real or not.' [¶] "The jury was not required to give defendant the benefit of the victim's inability to say conclusively the pistol was a real firearm. This is so because 'defendant's own words and conduct in the course of an offense may support a rational fact finder's determination that he used a [firearm].' (*People v. Rodriguez, supra*, 20 Cal.4th at p. 13.) Indeed, even though for purposes of section 12022.53, subdivision (b), a firearm need not be loaded or even operable, 'words and actions, in both verbally threatening and in displaying and aiming [a] gun at others, [can] fully support[] the jury's determination the gun was sufficiently operable [and loaded].' [Citations.] Accordingly, jurors 'may draw an inference from the circumstances surrounding the robbery that the gun was not a toy.' (*People v. Aranda* (1965) 63 Cal.2d 518, 533 [47 Cal.Rptr. 353, 407 P.2d 265] (hereafter *Aranda*).)" (*Monjaras, supra,* 164 Cal.App.4th at pp. 1435-1437.)

This logic applies squarely to our case. Comparable to *Monjaras*, the victim testified that, during the course of the robbery, after he had been forced to the ground by

one of the co-responsibles, minor told him to "Give it up," while lifting his sweatshirt to reveal a gun at his hip. Minor understood the gun to be real, and was scared. No evidence suggested the gun was a fake or replica. Under these circumstances, minor's words and actions permitted the fact finder to draw an inference that his gun was a real firearm and not a toy gun or firearm replica.[17] (*People v. Panah* (2005) 35 Cal.4th 395, 489 ["uncorroborated testimony of a single witness is sufficient to sustain a conviction, unless the testimony is physically impossible or inherently improbable"].)

In reaching this conclusion, we reject minor's claim that the *Monjaras* decision is flawed because it effectively relieves the prosecution of its burden under the United States Constitution to prove every element of the crime charged beyond a reasonable doubt. Indeed, the reasoning in *Monjaras* is far from novel; rather, it is solidly based on a wealth of California case law upholding imposition of a firearm enhancement on the basis of circumstantial evidence. (See *People v. Rodriguez, supra,* 20 Cal.4th at pp. 11-12, and cases discussed therein. Compare *People v. Hunter* (2011) 202 Cal.App.4th 261, 275-276 ["when a defendant displays an object that looks like a gun, the object's appearance and the defendant's conduct may constitute sufficient circumstantial evidence to support a finding *that it was not a firearm*"].) More specifically, the conclusion in *Monjaras* that the defendant's threatening words ("Bitch, give me your purse"), coupled with his purposeful act of pulling up his shirt and displaying a pistol, sufficed to prove his use of a loaded weapon, is firmly grounded in California Supreme Court authority. (*People v. Rodriguez, supra,* 20 Cal.4th at pp. 11-12 [in concluding that the evidence sufficed to prove assault with a firearm (and thereby reversing the appellate court decision), the high court explained: "[The victim] testified that when defendant put the gun to his chin, he warned [him] to keep his mouth shut or 'I could do to you what I did to them.' The [appellate court] majority saw this testimony as pertaining only to the irrelevant question of whether defendant had made a punishable threat, and so apparently dismissed it from consideration on the issue of sufficiency of the evidence. In fact,

---

17      The victim could see the silver firearm's clip and "a little bit of the front."

however, the jury could reasonably have interpreted the warning as an admission by defendant of his present ability to harm [the victim]"]; see also *People v. Aranda, supra,* 63 Cal.2d at p. 533.) While there are, of course, some factual differences in these cases (for example, in *People v. Rodriguez*, the sufficiency-of-the-evidence issue related to the defendant's conviction for assault with a firearm), the underlying legal principle is the same – to wit, the principle that a reasonable inference may be drawn that a defendant had a loaded gun based solely on circumstantial evidence. And, applying this legal principle to the record at hand, we conclude that the evidence of minor's firearm use during the robbery, even if circumstantial, was indeed substantial, particularly when appropriately viewed by this court in a light most favorable to affirming the judgment. (See *People v. Rodriguez, supra,* 20 Cal.4th at p. 11 [" 'Although it is the duty of the jury to acquit a defendant if it finds that circumstantial evidence is susceptible of two interpretations, one of which suggests guilt and the other innocence [citations], it is the jury, not the appellate court[,] which must be convinced of the defendant's guilt beyond a reasonable doubt. ' "If the circumstances reasonably justify the trier of fact's findings, the opinion of the reviewing court that the circumstances might also reasonably be reconciled with a contrary finding does not warrant a reversal of the judgment" ' "].)

## VI. Limitations on Defense Counsel's Summation.

Finally, minor contends the juvenile court violated his constitutional rights to due process, a fair trial, and effective assistance from counsel by granting the prosecution one hour for summation, while providing all three defense counsel the same one-hour time period to share for summation. The relevant facts are as follows.

Just before the close of evidence, the juvenile court informed counsel for the parties that the prosecution would receive one hour for summation and each of the three defense counsel would receive 20 minutes. The court then added that, "If we get to the point where there is something really significant, I'll make the decision on whether to give you more time or not. I probably won't. An hour is really plenty in my opinion."

Minor's counsel was thereafter the last of the three defense attorneys to give her closing argument. Before turning to the specific facts of this case, minor's counsel

25

referenced the time limit, stating: "I know that we're only given 20 minutes, and I'm going to hopefully not speak too fast, but I have a lot to say. The trial was over a week. This is a strike that will affect my client for the rest of his life, and I feel that I need to address many points in this case. And so I'll try to do it as briefly as I can but as competently as I can." Then, when the court urged her to proceed, counsel added: "I understand. I'm just telling the court that I have a lot to say, so I might only briefly discuss something, but I hope the court knows that I – I have this very brief period in which to speak."

Later, after minor's counsel had argued for 25 minutes, the court told her that she had exceeded the allocated time for her summation, and that she had about five more minutes to conclude. Counsel then wrapped up her argument in the minutes that followed without requesting any additional time or objecting that she had been precluded from completing her summation. Based upon these circumstances, and given certain conflicts of interests among the three co-responsibles in this case, minor claims reversible error occurred. We disagree.

The relevant law is not in dispute. In recognition of their constitutional right to assistance of counsel, juveniles in delinquency proceedings have a right to present a closing argument at trial. (*In re William F.* (1974) 11 Cal.3d 249, 255 ["the presentation of an argument by counsel based upon the evidence introduced at the hearing is an integral part of the right of a juvenile to be represented by counsel at a jurisdictional hearing, and . . . the denial of that right unless waived is a denial of due process of law"]; *Herring v. New York* (1975) 422 U.S. 853, 856-857.) At the same time, however, the trial court has discretion to set appropriate limits on the time provided for such arguments: "It is within a trial court's discretion . . . to determine when such right has been fully asserted in consideration of the nature of the case, the quantity of evidence received, the conflicts in the evidence, if any, the nature and complexity of the legal issues, whether the trial is to a jury or the court, and all other relevant circumstances bearing on the factfinding process. At such time as the right has been fully and fairly asserted the trial court may, in the exercise of its sound discretion, terminate argument

26

without infringing on the constitutional right." (*In re William F., supra,* 11 Cal.3d at p. 255 & fn. 5; see *People v. Bonin* (1988) 46 Cal.3d 659, 695 & fn. 4 [noting that, to "the extent that *In re William F., supra*, 11 Cal.3d 249 – a case in which no argument at all was permitted – implies that error adversely affecting defense counsel's closing argument necessarily infringes on the defendant's constitutional right to the assistance of counsel," it is disapproved].) On appeal, we review a trial court's imposition of limitations on defense counsel's closing argument for abuse of discretion. (See *People v. Benavides* (2005) 35 Cal.4th 69, 110-111.)

Moreover, regardless of the constitutional rights at stake, another set of well-established legal principles apply – to wit, those relating to a defendant's forfeiture of the right to raise a particular issue on appeal: "Ordinarily, a criminal defendant who does not challenge an assertedly erroneous ruling of the trial court in that court has forfeited his or her right to raise the claim on appeal. [Citation.] As the United States Supreme Court recognized . . . ' "[n]o procedural principle is more familiar to this Court than that a constitutional right," or a right of any other sort, "may be forfeited in criminal as well as civil cases by the failure to make timely assertion of the right before a tribunal having jurisdiction to determine it." ' [Citations.] 'The purpose of this rule is to encourage parties to bring errors to the attention of the trial court, so that they may be corrected. [Citation.]' [Citations]." (*In re Sheena K.* (2007) 40 Cal.4th 875, 880-881 [footnote omitted].)

Here, we conclude the record does in fact establish minor's forfeiture of the right to challenge the juvenile court's limitations on his attorney's closing argument. As mentioned above, before addressing the particulars of minor's case, his attorney made reference to the time limit imposed by the court, stating, "I know that we're only given 20 minutes, and I'm going to hopefully not speak too fast, but I have a lot to say . . . ." In addition, minor's counsel noted, "I have a lot to say, so I might only briefly discuss something, but I hope the court knows that I – I have this very brief period in which to speak." However, counsel's statements do not amount to a valid objection, which must be both timely and specific. (*People v. McDonough* (2011) 196 Cal.App.4th 1472, 1488

27

["judgment will not be set aside due to an error in admitting evidence absent a timely objection in the trial court clearly stating the specific ground of the objection"].) In light of this fact, we conclude minor's final claim has been forfeited. Had a formal objection been raised with respect to the restrictions placed upon closing argument in an appropriate, specific and timely manner, the juvenile court would have had the opportunity to reflect upon any concerns of minor's counsel, and may well have provided counsel additional time, rendering any further action by court or counsel unnecessary. However, in the absence of such objection, the juvenile court was deprived of this opportunity to preemptively review its own ruling.

In any event, even if minor had not forfeited this challenge, we would nonetheless conclude no prejudice resulted from the court's imposition of the time restriction on his counsel's closing argument. In so concluding, we note, first, that minor's counsel was provided additional time beyond the court's 20-minute limit, ultimately receiving about 30 minutes for her summation. In addition, the issues raised in this case were fairly discrete. There was one primary witness – to wit, the victim – and one primary defense – to wit, that minor was wrongly identified by the victim as the perpetrator of the robbery who used a real firearm. As such, the key objective of all co-responsibles, including minor, was to attack the victim's credibility and, in particular, the reliability of his identifications. Thus, while the interests of the three co-responsible minors were not wholly aligned, they shared enough common interests that the juvenile court had a reasonable basis for striving to limit redundancies in the arguments of their counsel by dividing one hour of time among them. (See *People v. Fernandez* (1906) 4 Cal.App. 314, 322, overruled on another ground in *People v. Burton* (1961) 55 Cal.2d 328, 352, ["counsel may be restricted to a discussion of matters relevant to the case and restrained from wasting the time of the court by useless repetition"].) Moreover, under these circumstances, and in light of the fact that the three defense counsel had, collectively, at least an hour, if not a bit more, for summation and did not seek additional time from the court, there is simply no basis for reversing the judgment on this ground.

28

## DISPOSITION

The juvenile court's judgment is affirmed.

_____
Jenkins, J.

We concur:


_____
McGuiness, P. J.


_____
Pollak, J.