Filed 11/15/19

CERTIFIED FOR PUBLICATION


COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA


| | |
|---|---|
| MANUEL BRACAMONTES, | D075671 |
| Petitioner, | |
| v. | (San Diego County Super. Ct. No. SCD178329) |
| THE SUPERIOR COURT OF SAN DIEGO COUNTY, | |
| Respondent; | |
| THE PEOPLE, | |
| Real Party in Interest. | |

ORIGINAL PROCEEDING in mandate.  John M. Thompson, Judge.  Petition granted in part and denied in part.

Mary K. McComb, State Public Defender, and AJ Kutchins, Deputy State Public Defender, for Petitioner.

No appearance for Respondent.

Summer Stephan, District Attorney, Mark A. Amador, Linh Lam, and Karl Husoe, Deputy District Attorneys, for Real Party in Interest.

Petitioner Manuel Bracamontes was sentenced to death in 2005 for the kidnapping and murder of nine-year-old Laura Arroyo. His automatic appeal is currently pending in the California Supreme Court. (*People v. Bracamontes* (S139702, app. pending).) In anticipation of a future petition for writ of habeas corpus, Bracamontes filed a motion in the San Diego County Superior Court to preserve evidence that may be relevant to such a petition. His motion sought a preservation order covering relevant physical and documentary evidence in the hands of the prosecution, various government entities, and four private individuals or entities that are the subject of this proceeding: Norman Sperber, a forensic dentist and tool mark expert; Rod Englert, a retired police officer and crime scene reconstructionist; and Orchid Cellmark, Inc. (Cellmark) and Serological Research Institute, Inc. (SERI), two forensic laboratories that conduct DNA testing and analysis. Bracamontes relied on *People v. Superior Court* (*Morales*) (2017) 2 Cal.5th 523 (*Morales*), which held that a court has jurisdiction to order preservation of evidence potentially subject to postconviction discovery under Penal Code section 1054.9.[1]

The superior court granted Bracamontes's motion in large part, but it declined to issue preservation orders to Sperber, Englert, Cellmark, or SERI. It reasoned that evidence in the possession of these private parties would not be subject to postconviction discovery under section 1054.9 and therefore the court had no jurisdiction to order its preservation.

---

[1] Further statutory references are to the Penal Code unless otherwise stated.

Bracamontes challenged the superior court's determination by petition for writ of mandate. He argued that Sperber, Englert, Cellmark, and SERI were acting on behalf of the prosecution and evidence in their possession was therefore subject to discovery under section 1054.9.

We summarily denied the petition. The California Supreme Court granted review and transferred the matter back to this court with directions "to vacate [our] order denying the petition for writ of mandate and to issue an order to show cause . . . why the relief sought in the petition should not be granted on the ground that private individuals and entities working on criminal cases at the behest and under the direction of law enforcement are subject to the discovery provisions of Penal Code section 1054.9 and the preservation obligations described in [*Morales*]." We issued the order to show cause as directed, and these proceedings followed.

We now conclude that the superior court erred by denying the preservation order directed at Cellmark and SERI. These entities participated in the investigation of Arroyo's murder at the behest and under the direction of law enforcement. Although few law enforcement organizations had the capacity to conduct DNA testing at the time of the murder, it is now seen as a core law enforcement function. Cellmark and SERI are therefore properly viewed as members of the prosecution team for purposes of discovery. Sperber and Englert, by contrast, were retained solely for their testimony at trial as independent expert witnesses. They did not participate in the investigation of the murder.

3

They were not part of the prosecution team as the concept has been defined. We therefore grant the petition in part and deny it in part, as described further below.[2]

FACTUAL AND PROCEDURAL BACKGROUND

Laura Arroyo disappeared on June 19, 1991, and her body was found the next morning. The Chula Vista Police Department (CVPD) led the investigation into her murder. Rodrigo Viesca, a CVPD evidence technician, took photographs and collected evidence from the crime scene, including a number of hair strands. The next day, Viesca attended Arroyo's autopsy. He took photographs of Arroyo's body, her clothing, and each stage of the autopsy. Viesca collected a number of biological samples during the autopsy, including additional hair strands, oral and vaginal swabs, a neck swab, and fingernail clippings. The medical examiner removed portions of Arroyo's jaw bone and shoulder blade, which showed signs of injury, and Viesca collected those samples as well. Viesca stored the biological evidence in the CVPD crime laboratory.

Soon after Arroyo's murder, CVPD detectives identified Bracamontes as a suspect. In August 1991, police obtained search warrants for Bracamontes's person, residence, and car. Viesca collected hair, blood, and saliva samples from Bracamontes. From his car, investigators obtained a white towel with an apparent blood stain.

_____

[2]    Bracamontes raises another contention in his petition, relating to the retention of judicial records, but it falls outside the scope of our order to show cause. We therefore need not consider it further. We note, however, that there appears to have been some uncertainty surrounding the scope and basis of Bracamontes's request for retention of judicial records in the superior court. Our decision here is made without prejudice to a renewed—and more straightforward—motion for retention of judicial records under Government Code section 68152, subdivision (h).

The CVPD sent hair strands collected at the crime scene to Cellmark and SERI for DNA testing. Cellmark did not find any DNA material; the results of SERI's testing is unclear from the record. The CVPD provided the bloodstained towel to the San Diego Sheriff's Department for analysis, which in turn sent it to SERI for DNA testing. SERI concluded that the blood on the towel did not come from Arroyo. Arroyo's fingernail clippings were sent to the Sheriff's Department and the Federal Bureau of Investigation (FBI) crime laboratory, but the testing they conducted and any results are also unclear. Despite identifying Bracamontes as a suspect, police made no arrests at the time.[3]

Twelve years later, in 2003, CVPD cold case investigators identified Arroyo's murder as a candidate for possible reexamination. They met with the former lead detective responsible for the investigation, as well as representatives of the San Diego County District Attorney's Office. They went over the physical evidence and asked the supervisor of the SDPD crime laboratory for advice. The supervisor suggested looking at certain biological evidence again. Viesca and a cold case investigator delivered the swabs from Arroyo's body and her fingernail clippings to the SDPD crime laboratory for testing.

---

[3] At the time of Arroyo's murder in 1991, the CVPD, the San Diego Police Department (SDPD), and the San Diego Sheriff's Department did not have the capability to conduct forensic DNA testing. They relied on private laboratories. The CVPD and SDPD routinely sent samples to Cellmark, and the Sheriff's Department sent samples to SERI in this case. (The FBI also had the capacity to conduct DNA testing.) By the early 2000's, both the SDPD and the Sheriff's Department had developed deep expertise in DNA testing. The CVPD still had not; it normally relied on the Sheriff's Department.

The SDPD crime laboratory detected sperm cells on the oral swabs. Laboratory personnel requested and received the biological samples previously obtained from Bracamontes for comparison. Based on DNA analysis, the laboratory concluded that Bracamontes was very likely the source of sperm on the oral swabs. Additional examination revealed sperm cells underneath both sets of fingernail clippings and on the neck swab. DNA testing showed that Bracamontes was very likely the source of these sperm cells as well.

CVPD officers arrested Bracamontes. Viesca again collected hair, blood, and saliva samples from him.

A deputy district attorney asked the SDPD crime laboratory to send various samples to Cellmark for confirmatory testing. The laboratory sent Cellmark the oral swabs, a vaginal swab, and a reference saliva sample obtained from Bracamontes. Cellmark also found sperm cells on an oral swab. It concluded, to a reasonable degree of scientific certainty, that Bracamontes contributed to the DNA sample on the oral swab.

The San Diego County Superior Court held a multi-week jury trial in August 2005. At trial, as relevant here, CVPD detectives and cold case investigators testified about their investigation into Arroyo's murder. Viesca testified about collecting evidence and sending it to various laboratories for testing. Employees of the SDPD and Sheriff's Department crime laboratories testified about their experience with DNA testing and the results of their testing efforts in this case.

The prosecution presented testimony from a DNA analyst employed by Cellmark. He testified that his main responsibility was to receive and analyze evidence from

6

government agencies throughout the United States. Cellmark charges fees for the DNA testing it performs and any resulting testimony. The analyst understood that the District Attorney's Office was paying his fees to testify in this case. Substantively, he described his process for analyzing the biological samples provided by the SDPD crime laboratory, as well as the conclusions summarized above.

The prosecution also presented testimony from two retained expert witnesses. The first, Norman Sperber, was a general licensed dentist, a forensic dentist (or "odontologist"), and tool mark expert. He received a degree in dentistry in 1954. He began doing forensic dentistry in 1964. Forensic dentistry covers several major areas, including identifying a deceased individual by dental records, determining the age of an individual, and analyzing injuries caused by teeth (e.g., "bite mark" evidence). Sperber had testified in approximately 225 cases, including over 30 non-teeth cases. For this case, Sperber analyzed the jaw bone and shoulder blade collected during Arroyo's autopsy. He also looked at photographs of her injuries, read reports from CVPD detectives and investigators, and visited the scene of the crime in May 2004 with Viesca and a cold case investigator. Sperber was asked to opine whether a gardening tool, specifically a pick mattock, could have inflicted the injuries seen on Arroyo's body. He concluded that the injuries to Arroyo's jaw bone and shoulder blade were very consistent with a pick mattock, as were divots found in the cement underneath Arroyo's body.

The prosecution's second retained expert was Rod Englert, a retired police officer and private crime scene reconstructionist. Englert testified that crime scene reconstruction is an effort to "determine what happened in the case" by reviewing case

7

files, viewing the scene of the crime, and building on the expertise of other investigators and experts. As a police officer, Englert participated in over 1,000 death investigations over 31 years. In the 10 years since his retirement, Englert had consulted on more than 380 cases. In this case, Englert was tasked with determining where Arroyo was killed, how she got to the location where her body was found, and whether her nonfatal injuries were inflicted at that location or elsewhere. He reviewed investigation and laboratory reports, as well as several hundred photographs. He went to the Sheriff's Department and viewed Arroyo's clothing. He also went twice to the location where Arroyo's body was found, at least once with Viesca. These visits also occurred in May 2004. After assuming certain facts about the condition of Arroyo's body and the location where it was found, Englert testified that Arroyo's nonfatal injuries were consistent with a sexual assault in a vehicle and, based on the condition of her body, she was incapacitated before she was killed. The murderer inflicted the fatal stab and chop wounds at the location where she was found.

The jury convicted Bracamontes, and he was sentenced to death. As noted, his automatic appeal is currently pending in the California Supreme Court. In December 2010, the California Supreme Court appointed the State Public Defender to represent him in that appeal. Bracamontes does not currently have habeas representation.

In December 2018, Bracamontes filed a motion in superior court seeking, among other things, an order directing various entities and individuals to preserve documentary and physical evidence relevant to a potential habeas proceeding. The proposed order was directed at the prosecution, various government entities, and four private individuals or

8

entities: Cellmark, SERI, Sperber, and Englert. The prosecution opposed the motion, in part. It argued that Cellmark, SERI, Sperber, and Englert were not prosecution or law enforcement authorities and therefore could not be subject to postconviction discovery under section 1054.9 or a preservation order under *Morales*. The superior court agreed. It declined to issue a preservation order to Cellmark, SERI, Sperber, or Englert. It found that "these entities would not be subject to a court order pursuant to Penal Code section 1054.9. Thus, these entities and the categories of material they may possess are not within this court's jurisdiction on this motion to preserve evidence."

Bracamontes filed a petition for writ of mandate challenging the superior court's application of section 1054.9 and *Morales*. After we summarily denied the petition, and the Supreme Court granted review and transferred the matter back to this court, we issued an order to show cause why "the relief sought in the petition should not be granted on the ground that private individuals and entities working on criminal cases at the behest and under the direction of law enforcement are subject to the discovery provisions of Penal Code section 1054.9 and the preservation obligations described in [*Morales*]."

DISCUSSION

I

*Postconviction Discovery and Preservation Orders*

Section 1054.9 provides a mechanism for convicted defendants to obtain discovery to assist in preparing a habeas corpus petition even before an actual petition has been filed. (*In re Steele* (2004) 32 Cal.4th 682 (*Steele*).) "[U]nder Penal Code section 1054.9, enacted in 2002, a defendant sentenced to death or life imprisonment

9

without the possibility of parole (LWOP) who is prosecuting a postconviction habeas corpus petition may seek discovery of 'materials in the possession of the prosecution and law enforcement authorities to which the same defendant would have been entitled at [the] time of trial.' " (*Morales*, *supra*, 2 Cal.5th at p. 527.)[4] But where, as here, a condemned prisoner cannot prosecute a postconviction habeas corpus petition because the Supreme Court has not appointed habeas counsel, the goals of the postconviction discovery statute may be thwarted by delay. *Morales* therefore concluded that "trial courts, which have jurisdiction under Penal Code section 1054.9 to grant condemned inmates' motions for postconviction discovery, have the inherent power to protect that jurisdiction by entertaining motions for the preservation of evidence that will ultimately be subject to discovery under that statute when the movant is appointed habeas corpus counsel." (*Morales*, at p. 533.) "Questions as to whether a movant is actually entitled to discovery of the material to be preserved, including compliance with the procedural requirements of Penal Code section 1054.9, will await the eventual filing and determination of the postconviction discovery motion." (*Id*. at p. 534.)

---

4    Section 1054.9 provides in relevant part:  "(a) In a case involving a conviction of a serious felony or a violent felony resulting in a sentence of 15 years or more, upon the prosecution of a postconviction writ of habeas corpus or a motion to vacate a judgment, or in preparation to file that writ or motion, and on a showing that good faith efforts to obtain discovery materials from trial counsel were made and were unsuccessful, the court shall, except as provided in subdivision (b) or (d), order that the defendant be provided reasonable access to any of the materials described in subdivision (c).  [¶] . . . [¶]  (c) For purposes of this section, 'discovery materials' means materials in the possession of the prosecution and law enforcement authorities to which the same defendant would have been entitled at time of trial."

The scope of a preservation order under *Morales* mirrors the scope of available discovery under section 1054.9. "An order purporting to require the preservation of materials beyond the scope of Penal Code section 1054.9 would thus exceed the trial court's jurisdiction on a motion to preserve evidence." (*Morales*, *supra*, 2 Cal.5th at p. 535.)

"Generally speaking, a trial court's ruling on discovery matters is reviewed for abuse of discretion." (*IAR Systems Software, Inc. v. Superior Court* (2017) 12 Cal.App.5th 503, 513 (*IAR Systems*).) However, where, as here, the primary dispute concerns the scope of preservation and discovery under the statute, our review is de novo. (*Shorts v. Superior Court* (2018) 24 Cal.App.5th 709, 719 (*Shorts*); accord, *Barnett v. Superior Court* (2010) 50 Cal.4th 890, 903 (*Barnett*) ["Whether discovery under section 1054.9 extends so far is a matter of statutory interpretation."].)

The question presented by this case is whether relevant evidence in the hands of private parties working with the prosecution is discoverable under section 1054.9 and therefore subject to a preservation order under *Morales*. Our Supreme Court explored similar issues in two opinions, *Steele*, *supra*, 32 Cal.4th 682 and *Barnett*, *supra*, 50 Cal.4th 890. We begin our analysis there.

*Steele* comprehensively examined the scope of discovery under section 1054.9, including "exactly who must possess the materials for them to come within its scope." (*Steele*, *supra*, 32 Cal.4th at p. 696.) The Supreme Court explained, "Section 1054.9, subdivision (b), refers to 'materials in the possession of the prosecution and law enforcement authorities . . . .' Thus, the materials include not only those the prosecution

itself possesses but those that law enforcement authorities possess. The discovery obligation, however, does not extend to all law enforcement authorities everywhere in the world but, we believe, only to law enforcement authorities who were involved in the investigation or prosecution of the case. This conclusion becomes clear on reading the statute in context. Section 1054.9 is part of the general discovery provisions of Penal Code section 1054 et seq. Those provisions limit trial discovery to materials the prosecutor possesses or knows 'to be in the possession of the *investigating* agencies . . . .' (Pen. Code, § 1054.1, italics added.) They also provide that the statutory provisions are the only means for the defendant to compel discovery 'from prosecuting attorneys, law enforcement agencies which investigated or prepared the case against the defendant, or any other persons or agencies which the prosecuting attorney or investigating agency may have employed to assist them in performing their duties.' (Pen. Code, § 1054.5, subd. (a).) Section 1054.9 does not require that the prosecutor *know* the materials are in the possession of the investigating agencies, but we believe the reference to 'law enforcement authorities' in section 1054.9, subdivision (b), must be read in light of these other provisions. *At trial*, these discovery obligations do not extend to materials possessed by law enforcement agencies that were not involved in investigating or preparing the case against the defendant. Section 1054.9, subdivision (b), should not be read as creating a broader *postconviction* discovery right." (*Ibid*.)

*Steele* interpreted the scope of section 1054.9 as "consistent with the scope of the prosecution's constitutional duty to disclose exculpatory information [under *Brady v. Maryland* (1963) 373 U.S. 83 (*Brady*)]. 'The scope of this disclosure obligation extends

12

beyond the contents of the prosecutor's case file and encompasses the duty to ascertain as well as divulge "any favorable evidence known to the others *acting on the government's behalf* . . . ." ' [Citation.] 'As a concomitant of this duty, any favorable evidence known to the others acting on the government's behalf is imputed to the prosecution. "The individual prosecutor is presumed to have knowledge of all information gathered *in connection with the government's investigation*." ' [Citation.] Thus, the prosecution is responsible not only for evidence in its own files but also for information possessed by others acting on the government's behalf that were gathered in connection with the investigation." (*Steele*, *supra*, 32 Cal.4th at pp. 696-697.)

*Barnett* reaffirmed *Steele*'s interpretation of section 1054.9. (*Barnett*, *supra*, 50 Cal.4th at pp. 901-903.) *Barnett* reiterated and relied on the same analogy to the prosecution's *Brady* obligations: "In *Steele*, we analogized section 1054.9's discovery provisions to the prosecution's duty to provide material exculpatory evidence, i.e., what is sometimes called ' "*Brady* material." ' [Citations.] As *Steele* explained, the pretrial obligation to provide *Brady* material extends not only to materials the prosecutor personally possesses but, to some extent, to materials others possess as well. [Citations.] But the duty does not extend to all law enforcement agencies that might possess relevant material." (*Barnett*, at p. 904.)

Numerous courts, in California and elsewhere, have considered the prosecution's disclosure and discovery obligations under *Brady* or pursuant to statute. In general, as noted, "[t]he scope of this disclosure obligation extends beyond the contents of the prosecutor's case file and encompasses the duty to ascertain as well as divulge 'any

13

favorable evidence known to the others acting on the government's behalf . . . .' " (*In re Brown* (1998) 17 Cal.4th 873, 879 (*Brown*), quoting *Kyles v. Whitley* (1995) 514 U.S. 419, 437.) We discuss the case law relevant to the specific private parties at issue here in the next parts.

II

*Cellmark and SERI*

Cellmark and SERI provided DNA testing services to the prosecutors and law enforcement agencies investigating Arroyo's murder. If they were government crime laboratories, it is beyond dispute that they would be part of the prosecution team for purposes of discovery. In *Brown*, our Supreme Court considered whether a crime laboratory (the Orange County Sheriff-Coroner, Department of Forensic Science Services) was part of the prosecution team. (*Brown*, *supra*, 17 Cal.4th at p. 877.) The court noted that "the lab 'worked closely with the District Attorney's Office in assisting it in the prosecution of cases'; and there is no serious dispute that in these circumstances it was part of the investigative 'team.' " (*Id*. at p. 880.) Similarly, in another case, our Supreme Court found that a California Department of Justice criminalist who "participated in the investigation of the . . . murder and was employed by an investigating agency" was part of the prosecution team. (*People v. Whalen* (2013) 56 Cal.4th 1, 64 (*Whalen*).)

Numerous non-California cases confirm that government crime laboratories are part of the prosecution team, even if not directly associated with the prosecuting authorities. (See, e.g., *State v. Davila* (Wash. 2015) 357 P.3d 636, 644 [state crime lab];

14

*Commonwealth v. Ware* (Mass. 2015) 27 N.E.3d 1204, 1212 [state drug lab]; *Cloird v. State* (Ark. 2002) 76 S.W.3d 813, 816 [state crime lab]; *State v. Meza* (Ariz.Ct.App. 2002) 50 P.3d 407, 412 [police crime lab]; *Harridge v. State* (Ga.Ct.App. 2000) 534 S.E.2d 113, 116 [state crime lab]; *Damian v. State* (Tex.Ct.App. 1994) 881 S.W.2d 102, 107 [county crime lab].)[5]

Our research has not revealed any case directly considering whether a private forensic laboratory is part of the prosecution team, and the parties have cited none. However, in *People v. Cordova* (2015) 62 Cal.4th 104, our Supreme Court appeared to accept that such a laboratory could be. The trial court had found that the private laboratory was part of the prosecution team for discovery purposes, at least as to the work it performed on defendant's case. (*Id*. at p. 122.) But the defendant sought records from other cases that might show instances of contamination. (*Id*. at p. 121.) The trial court denied the request. (*Id*. at p. 123.) In the Supreme Court, the defendant argued that he was entitled to discovery of records from other cases. (*Ibid*.) The Supreme Court noted that the defendant had received "full discovery regarding the work [the laboratory] performed in this case." (*Ibid*.) The Supreme Court found it unnecessary to decide

---

5    Courts have come to the same conclusion regarding county coroner and medical examiners' offices. "Autopsies by county coroner-medical examiners serve more than a single purpose. [Citation.] Here, information from the autopsies of the three victims allegedly murdered by [the defendant] was introduced at his trial[;] and the pathologists who performed [two of the] autopsies testified during the penalty phase of the trial. . . . [¶] Those offices unquestionably assisted the prosecutor to prepare the capital case against [the defendant]." (*Shorts*, *supra*, 24 Cal.App.5th at p. 727; see *McKim v. Cassady* (Mo.Ct.App. 2015) 457 S.W.3d 831, 855 ["A medical examiner acts on the government's behalf in a case . . . ."].)

15

whether the defendant was entitled to additional discovery because it would not have been "material" under *Brady*. (*Id.* at p. 124.) It is axiomatic that opinions are not authority for propositions not considered, but *Cordova* confirms that Bracamontes's request for a preservation order covering Cellmark and SERI is not unreasonable.

More directly authoritative is *People v. Uribe* (2008) 162 Cal.App.4th 1457 (*Uribe*), which considered the discoverability of materials in possession of a sexual assault response team (SART) nurse employed by a private hospital. The appellate court found no relevant authorities, so it considered the specific facts of the case to determine whether a video of the SART examination, known only to the SART personnel employed by the hospital, should have been considered in the constructive possession of the prosecution and therefore subject to disclosure under *Brady*. (*Id.* at p. 1476.) To determine this issue, the court asked " 'whether the person or agency has been "acting on the government's behalf" [citation] or "assisting the government's case." ' " (*Ibid.*) The court noted that SART examinations are regulated by statute, and the Legislature expressly contemplated that standards were needed " 'to provide comprehensive, competent *evidentiary examinations for use by law enforcement agencies.*' " (*Id.* at p. 1477.)

*Uribe* concluded that the SART exam was investigative: "It was clearly spearheaded by the police, who advised [the nurse] of a report of alleged sexual abuse in which [the minor] was the victim. A major purpose of the examination was to determine whether the allegation could be corroborated with physical findings. [The nurse] collected and preserved physical evidence, consistent with statutory protocol. [Citations.]

16

And according to her practice—after completion of the SART examination and after she and [a doctor] reach concurrence as to their findings as contained in the written report—[the nurse] provided a copy of the forensic report to the police." (*Uribe*, *supra*, 162 Cal.App.4th at p. 1479.) The SART personnel were therefore " ' "acting on the government's behalf" ' or ' "assisting the government's case" ' " and were part of the prosecution team for *Brady* purposes. (*Id*. at p. 1482.)

State and federal courts have agreed with *Uribe*'s conclusion. (See, e.g., *McCormick v. Parker* (10th Cir. 2016) 821 F.3d 1240, 1247-1248 [certified sexual assault nurse examiner "was part of the prosecution team because she acted at the request of law enforcement in the pre-arrest investigation of a crime"].) Similarly, the West Virginia Supreme Court found that a private, out-of-state forensic psychologist who interviewed a potential witness to a child sexual assault was part of the prosecution team because the interview took place at the request of the prosecution and was monitored remotely by a police officer. (*State v. Farris* (W.Va. 2007) 656 S.E.2d 121, 123, 126.)

This court's contrasting conclusion in *People v. Superior Court* (*Dominguez*) (2018) 28 Cal.App.5th 223 (*Dominguez*) provides illustrative context. *Dominguez* considered whether ESR, a developer of forensic software used to analyze complex DNA samples, was part of the prosecution team for *Brady* purposes. (*Id*. at p. 228.) The SDPD crime laboratory used ESR's software to test DNA samples obtained from blood-soaked gloves found near the scene of the crime. (*Id*. at p. 227.) The court concluded that ESR was not part of the prosecution team. "Foremost, we observe that ESR provided no input or assistance specific to [the defendant's] case—except insofar as the prosecution's use of

17

its software program can be deemed tantamount to ESR investigating the case. Indeed, were it not for this discovery request, ESR would likely have no knowledge of the matter whatsoever. Accordingly, we cannot fairly say that *ESR* 'investigated' the charges at hand." (*Id*. at p. 236.) The court rejected the defendant's argument that "ESR's provision of software updates, technical support, and initial training to the lab renders it a member of the prosecution team." (*Id*. at p. 237, fn. omitted.) These "generalized activities" did not show that "ESR was 'acting on the government's behalf *in the case*.' " (*Ibid*.)

*Dominguez* provides a useful summary of some considerations surrounding the scope of discovery and disclosure in this context. "Although ' "[t]here is no clear test to determine when an individual is a member of the prosecution team" ' within the meaning of *Brady*, case law illumines a rough framework. [Citation.] ' "At its core, members of the team perform investigative duties and make strategic decisions about the prosecution of the case." ' [Citation.] Yet the ' "team may also include individuals who are not strategic decision-makers," ' e.g., ' "testifying police officers and federal agents who submit to the direction of the prosecutor and aid in the [g]overnment's investigation." ' [Citation.] [¶] To be sure, ' "[i]nteracting with the prosecution team, without more, does not make someone a team member." ' [Citation.] But greater involvement with the team makes imputation more likely. In that vein, relevant circumstances include ' "whether the individual actively investigates the case, acts under the direction of the prosecutor, or aids the prosecution in crafting trial strategy." ' [Citation.] Likewise, since the underlying justification is imputation, the question can also be phrased as one ' "of agency law: should a prosecutor be held responsible for someone else's actions?" ' [Citation.] This, in

18

turn, requires consideration of—in simple terms—the 'degree of control' the prosecution exercises over the ostensible agent." (*Dominguez*, *supra*, 28 Cal.App.5th at pp. 234-235, quoting *IAR Systems*, *supra*, 12 Cal.App.5th at pp. 516-518.)

Here, like the government crime laboratories in *Brown* and *Whalen*, and the SART nurse in *Uribe*, there can be no dispute that Cellmark and SERI assisted in the government's investigation into Arroyo's murder. They were contracted by the government to conduct DNA testing of critical evidence in an effort to identify or exclude suspects, including Bracamontes. Their work was quintessentially investigative in nature and specific to this case. They were contracted to perform certain tasks, dictated by law enforcement, in exchange for payment. They provided the results of their work to law enforcement. They performed their work on behalf of the government, not on their own accord, and they carried out the government's directions about what evidence to test and what results might be relevant. They developed facts, by determining whether DNA was present and, if so, what the components of that DNA were. Although the government did not dictate the specific scientific techniques employed or the results to be obtained, the same is true in the government's interactions with its own crime laboratories. The district attorney emphasizes the "independent" character of Cellmark and SERI, as opposed to the SDPD crime laboratory, but in both cases their work was conducted on behalf of the government, which directed their inquiry but not their results. In all relevant respects, Cellmark and SERI had the same relationship to the prosecution and law enforcement as a government crime laboratory. And, Cellmark went further, agreeing to provide an employee to testify at Bracamontes's trial. Under these circumstances, Cellmark and

19

SERI are not distinguishable from the government crime laboratories that are now universally seen as part of the prosecution team. We therefore conclude that physical and documentary evidence in their possession, related to their work in this matter, is potentially discoverable under section 1054.9 and therefore subject to a preservation order under *Morales*.

In her contrary argument, the district attorney contends that a close agency relationship must exist between the government and the private party, such that the private party has the authority to bind the government. She argues, "Thus, this 'power to bind' the government is a key characteristic which must exist between the prosecution and a retained third-party for that third-party to qualify for prosecution team membership." The district attorney's focus on the power or authority to bind the government is misplaced. Our Supreme Court has never indicated that the test for prosecution team membership involves the authority to bind the government. The standard instead is whether the private party is acting on the government's behalf and assisting in investigation or prosecution of the crime, such that it is reasonable to impute the private party's knowledge to the prosecution. (*Barnett*, *supra*, 50 Cal.4th at pp. 902-903; *Steele*, *supra*, 32 Cal.4th at pp. 696-697.)

The authority to bind was referenced fleetingly in a single Court of Appeal opinion, in a quotation from a federal district court opinion. (See *IAR Systems*, *supra*, 12 Cal.App.5th at p. 518, quoting *United States v. Meregildo* (S.D.N.Y. 2013) 920 F.Supp.2d 434, 443-444.) *IAR Systems* considered whether the prosecution's *Brady* obligations extended to materials in the possession of a corporate attorney who

20

cooperated with prosecutors in the criminal case against his client's former employee. The court quoted the federal district court's discussion of agency law, in part, as follows: " 'Generally, a principal is responsible for the knowledge of an agent when that agent has a "duty to give the principal information" or when the agent acts on his knowledge regarding a matter that is "within his power to bind the principal."  Restatement (Second) of Agency § 272.  An agent's duty to disclose is thus linked to his power to bind the principal.' " (*IAR Systems*, at p. 518, quoting *Meregildo*, at p. 444.)  But, as the quotation shows, an agent's duty to disclose is also linked to his duty to give the principal information.  It therefore appears to have little independent analytical value in this context.

In any event, despite this reference, *IAR Systems* did not return to the authority to bind in its analysis.  Instead, consistent with Supreme Court authorities and our discussion above, *IAR Systems* explained, "the issue, in essence, is whether the prosecution has exercised such a degree of control over the nongovernmental actor or witness that the actor or witness's actions should be deemed to be those of the prosecution for purposes of *Brady* compliance." (*IAR Systems*, *supra*, 12 Cal.App.5th at p. 518.) "[O]ur focus is on whether the third party has been acting under the government's direction and control by, for example, 'actively investigat[ing] the case, act[ing] under the direction of the prosecutor, or aid[ing] the prosecution in crafting trial strategy.' " (*Id*. at p. 521.)

*IAR Systems* concluded that the cooperating witness in that case was undertaking his tasks on behalf of his client, which was also pursuing a civil action against the

21

defendant, and not on behalf of the prosecution. (*IAR Systems*, *supra*, 12 Cal.App.5th at p. 522.) "The fact that these tasks sometimes overlapped with the district attorney's efforts to prosecute defendant, and that [the corporate attorney] cooperated with the district attorney in its efforts to uncover the truth about defendant's wrongdoing, does not, without more, make them 'team members' for purposes of *Brady*." (*Ibid*., fn. omitted.)

The district attorney is therefore incorrect to focus on a formal agency relationship, to the exclusion of other factors. Her reliance on *Secci v. United Independent Taxi Drivers, Inc*. (2017) 8 Cal.App.5th 846, 855, which considered agency in the context of corporate vicarious liability, is wholly unpersuasive. The district attorney has not cited any published opinion considering section 1054.9 or *Brady* disclosure that engaged in such analysis, and we have likewise found none.

The district attorney also relies on *Barnett*, *supra*, 50 Cal.4th 890. The specific dispute in *Barnett* involved a postconviction discovery request for materials in the physical possession of out-of-state law enforcement agencies that had provided certain limited assistance to California prosecutors. (*Id*. at p. 903.) *Barnett* concluded, "Although the out-of-state law enforcement agencies acted on behalf of the prosecution in a limited sense, we believe that they are not part of the ' "prosecution team" ' as discussed in *Steele*, *supra*, 32 Cal.4th at page 697." (*Ibid*.)

*Barnett* noted three relevant questions identified by federal courts considering similar situations: " ' "(1) whether the party with knowledge of the information is acting on the government's 'behalf' or is under its 'control'; (2) the extent to which state and federal governments are part of a 'team,' are participating in a 'joint investigation' or are

22

sharing resources; and (3) whether the entity charged with constructive possession has 'ready access' to the evidence." ' " (*Barnett*, *supra*, 50 Cal.4th at p. 904.) *Barnett* held that, although the out-of-state agencies were in some sense working on behalf of California prosecutors, they were not under their control. (*Ibid*.) Any information gathered by the out-of-state agencies but not provided to California prosecutors could not be considered within the scope of the agencies' work on their behalf. (*Ibid*.) "If California prosecutors did not receive the information, no reason appears to believe they had or have ready access to it." (*Ibid*.)

The district attorney argues that the questions identified in *Barnett* support the conclusion that Cellmark and SERI were not part of the prosecution team. We disagree. As an initial matter, the questions in *Barnett* were drafted for an analysis quite different than the analysis here, i.e., how to distinguish between voluntary cooperation by another state or federal law enforcement agency and a truly joint investigation giving rise to cross-jurisdiction constructive knowledge. (See *Barnett*, *supra*, 50 Cal.4th at p. 904; see also *United States v. Risha* (3d Cir. 2006) 445 F.3d 298, 304 [identifying the factors adopted in *Barnett* for this purpose].) To the extent the *Barnett* questions are relevant at all, they support our conclusion. Cellmark and SERI acted on behalf of the government and under its control, they assisted in the investigation into Arroyo's murder and were provided government resources (i.e., money) to do so, and no party has raised any issue regarding the government's ability to obtain relevant records from the laboratories.

23

Cellmark and SERI were served with Bracamontes's motion and his petition for writ of mandate, and they have not appeared or raised any objections on their own behalf.[6]

In sum, Cellmark and SERI provided DNA testing services at the behest and under the direction of the government in connection with the government's investigation into Arroyo's murder. These services were plainly investigative and are now seen as core law enforcement functions. Under these circumstances, Cellmark and SERI were acting on behalf of the government. Relevant physical and documentary evidence related to their work in this matter is therefore potentially subject to discovery under section 1054.9 and preservation under *Morales*. We express no opinion regarding whether any category of evidence is actually discoverable; such a determination must await specific discovery requests under the statute.

III

*Sperber and Englert*

Unlike Cellmark and SERI, Sperber and Englert's involvement in this matter did not begin until after Bracamontes was arrested. They were retained as expert witnesses in advance of Bracamontes's trial. Although each person must be evaluated according to his or her specific circumstances, federal courts have recognized that expert witnesses are unlikely to be viewed as prosecution team members merely by the fact of their retention

---

6    We note that the district attorney misinterprets the third *Barnett* question, incorrectly arguing that the relevant consideration is the private party's access to government records. Instead, as the entity charged with constructive possession, the *government's* access to the private party's records is the pertinent consideration. (See *Barnett*, *supra*, 50 Cal.4th at p. 904.)

or testimony at trial. "Although the Government must 'learn of any favorable evidence known to . . . others acting on the government's behalf in the case,' [citation], that duty does not extend to the knowledge of an ordinary expert witness who was not involved with the investigation of the case, [citation]." (*United States v. Skelly* (2d Cir. 2006) 442 F.3d 94, 100; accord, *Avila v. Quarterman* (5th Cir. 2009) 560 F.3d 299, 308-309.)

For example, in *United States v. Stewart* (2d Cir. 2006) 433 F.3d 273, the federal appellate court considered whether false testimony by a federal government laboratory director should be imputed to the prosecution. (*Id*. at p. 295.) The director provided expert testimony at trial on the composition of ink. (*Ibid*.) Drawing on *Brady* principles, the court determined that the director was not part of the prosecution team such that his knowledge should be imputed to prosecutors. (*Id*. at pp. 298-299.) It explained, "[T]he propriety of imputing knowledge to the prosecution is determined by examining the specific circumstances of the person alleged to be an 'arm of the prosecutor.' [Citation.] It does not turn on the *status* of the person with actual knowledge, such a law enforcement officer, prosecutor or other government official. In other words, the relevant inquiry is what the person *did*, not who the person *is*." (*Id*. at p. 298.) The court approved of the federal district court's conclusion that the director "acted as an ordinary expert witness and not as part of the 'prosecution team[.]' " (*Ibid*.) The facts "demonstrate that [the expert's] role was limited to matters concerning his area of expertise—ink. In that regard, [the expert] analyzed a single document, explained the forensic ink tests that had been performed, discussed potential testimony by the defense ink expert, assisted prosecutors to develop cross-examination questions addressing

25

certain technical aspects of ink testing, and participated in a mock examination on ink issues to prepare for trial. His testimony at trial related only to his credentials, the tests that were performed and the conclusions he drew from them. None of this suggests that [the expert] was in any way involved with the investigation or presentation of the case to the grand jury. He did not interview witnesses or gather facts, nor, with the exception of the [document in question], did he review documents or develop prosecutorial strategy." (*Id*. at pp. 298-299.)

We conclude that the general rule applies to Sperber and Englert. Although they performed work on behalf of the government, and not on their own accord, they did not conduct any of the activities previously recognized as indicative of prosecution team membership. They performed no investigative tasks, nor did they make any strategic decisions regarding presentation of evidence or trial strategy. (See *Dominguez*, *supra*, 28 Cal.App.5th at p. 235.) Their role appears to have been limited to reviewing facts and evidence developed by others and rendering opinions for use at trial. Beyond their trial testimony, the government does not appear to have attempted to use Sperber or Englert for its own benefit. Bracamontes emphasizes their visit to the scene of Arroyo's murder, but that visit occurred more than a decade afterward. A CVPD employee, Viesca, conducted all relevant evidence collection at the time Arroyo's body was found. Their later site visit cannot be viewed as investigatory in any meaningful sense. It was mere preparation for their testimony at trial. They did not act on the government's behalf in connection with its investigation. (See *Steele*, *supra*, 32 Cal.4th at p. 697.)

26

While the government exercised some degree of control over Sperber and Englert by giving them their tasks and providing them with the relevant factual universe, their role as ordinary expert witnesses necessarily placed them at some distance from the prosecution. This fact distinguishes Sperber and Englert from Cellmark and SERI. The latter entities worked with the government to develop evidence, performing specific tests at the government's direction. Sperber and Englert merely reviewed evidence already collected.

Finally, the record shows that neither Sperber nor Englert played a crucial role in Bracamontes's prosecution. Sperber's trial testimony spans approximately 20 transcript pages, and his cross-examination consisted of only four questions. His opinions about the marks on Arroyo's jaw bone and shoulder blade do not appear to have been particularly controversial. Englert's trial testimony covers approximately 50 pages. While his conclusions regarding the manner of Arroyo's sexual assault and murder were not insignificant, they did not form the core of the prosecution's case in the same manner as DNA testing. In closing arguments, DNA evidence was the primary focus of the prosecutor. Although the arguments of defense counsel are not part of the record, it appears they too focused on DNA testing, specifically the purported conflict between DNA testing results in 1991 and 2003. In the transcripts we have, Sperber and Englert are not mentioned.

Under these circumstances, it would not be reasonable to attribute knowledge of Sperber and Englert's work on this case to the government. They were ordinary expert witnesses, not members of the prosecution team. There is no evidence they stepped

outside that role.  The superior court therefore did not err by denying a preservation order directed to them.

## DISPOSITION

The petition is granted in part.  Let a peremptory writ of mandate issue directing the superior court to (1) vacate its preservation order to the extent it denies relief as to Cellmark and SERI and (2) enter a new order directing Cellmark and SERI to preserve all relevant physical and documentary evidence related to their work in this matter.  In all other respects, the petition is denied.

GUERRERO, J.

WE CONCUR:

McCONNELL, P. J.

HUFFMAN, J.